803 F.2d 351
 42 Fair Empl.Prac.Cas. 1, 41 Empl. Prac. Dec.
P 36,567,
55 USLW 2275, 35 Ed. Law Rep. 646
 Jerrold S. PIME, Plaintiff-Appellant,
v.
LOYOLA UNIVERSITY OF CHICAGO, an Illinois not-for-profit
Corporation, Defendant-Appellee.
Jerrold S. PIME, Plaintiff-Appellee,
v.
LOYOLA UNIVERSITY OF CHICAGO, an Illinois not-for-profit
Corporation, Defendant-Appellant.
 Nos. 84-1853, 84-1933.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 26, 1986.
Decided Oct. 16, 1986.
 
 Leon S. Conlon, Chicago, Ill., for Loyola University of Chicago.
 Paul K. Jacobi, Schwartz Cooper Kolb & Gaynor, Chicago, Ill., for Jerrold S. Pime.
 Before WOOD, and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Appellant Jerrold S. Pime brought suit against Loyola University of Chicago under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2(a), for religious discrimination in the hiring of tenure track professors in Loyola's College of Arts and Sciences, Department of Philosophy. The Department of Philosophy had passed a resolution reserving the next three vacancies in tenure track teaching positions for Jesuits, members of the Society of Jesus.
 
 
 2
 Loyola asserted two affirmative defenses. First, it claimed that it could require its employees to be Jesuits (and thus Catholics) under 42 U.S.C. Sec. 2000e-2(e)(2) (hereafter (e)(2)). Subsection (e)(2) permits an educational institution to employ persons of a particular religion if the institution is "in whole or in substantial part, owned, supported, controlled, or managed ... by a particular religion or by a particular religious corporation, association, or society." It also claimed it could require those employees to be Jesuits according to 42 U.S.C. Sec. 2000e-2(e)(1) (hereafter (e)(1)). Subsection (e)(1) permits an employer to employ an individual "on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." [BFOQ]
 
 
 3
 The district court judge, after a bench trial, granted judgment in favor of Loyola after finding that being a Jesuit was a BFOQ. Pime v. Loyola University of Chicago, 585 F.Supp. 435, 443 (N.D.Ill.1984). Plaintiff Pime challenges the finding of a BFOQ. Defendant Loyola challenges Judge Leighton's conclusion that Loyola could not rely on subsection (e)(2).
 
 I. BACKGROUND
 
 4
 The Society of Jesus is a religious order of the Roman Catholic Church. Its members, who are, with few exceptions, priests, are called Jesuits. The order has been characterized by interest and particular energy in the promotion of education, and has established twenty-eight universities in the United States. Jesuits are required to complete a protracted course of training and to make perpetual vows. Once they accept positions as professors they continue to incorporate their religious mission into their professional work.
 
 
 5
 Loyola University of Chicago has a long Jesuit tradition. Since 1909 its legal entity has been an Illinois not-for-profit corporation. Until 1970, it was governed by a Board of Trustees, all members of which were Jesuits. It has become a large university, consisting of ten schools and colleges, a medical center and a hospital. Presently 93% of academic administrators are non-Jesuit, as are 94% of the teaching staff.
 
 
 6
 In 1970, apparently to respond to the needs of growth, the Board amended the By-laws, enlarging the Board to 23, but requiring that one more than one-third must be Jesuits. The majority are in fact non-Jesuit. Amendment of the By-laws requires a two-thirds vote. The By-laws provide, however, that the president, who is the principal executive officer, must be a Jesuit.
 
 
 7
 Every undergraduate must take three Philosophy courses. About 75% of the students come from Catholic backgrounds. There was testimony by the President that, "I'm convinced that of all the things we say about Loyola, the most effective single adjective in attracting students and alumni support and benefactors is its Jesuitness."
 
 
 8
 In the fall of 1978, there were 31 tenure track positions in the Philosophy Department. Seven had been held by Jesuits, but one had resigned and two more retirements were imminent. On October 12, the department chairman reported to a meeting of the department faculty as follows:
 
 
 9
 We anticipate 3 full-time faculty openings in the Philosophy Department beginning September 1979. They are the position of Fr. Dehler and those of Fr. Grant and Fr. Loftus after they retire at the end of the current academic year. There are two different kinds of departmental needs which seem to bear heavily on the decision as to the kind of persons we should seek to hire for these openings.
 
 
 10
 1. The first is a need which the Chairman voiced two years ago just after Fr. Dehler's resignation. That is, the need for an adequate Jesuit presence in the Department. We are a Philosophy Department in a University with a Jesuit tradition. It is mainly by reason of this tradition that philosophy has the importance it does in the education of Loyola undergraduates. Therefore, it behooves us, however strongly we may feel about "the autonomy of philosophy," to acknowledge our association with this tradition. One very basic and obvious way of making such acknowledgement is by insisting upon an adequate Jesuit presence in the faculty of the Department. With the retirement of Father Grant and Father Loftus, we shall be left with 4 out of 31 faculty positions occupied by Jesuits. 4 out of 31 is not an adequate Jesuit presence in the Department. In the judgment of the Chairman, it would be highly desirable to fill all three openings with professionally competent Jesuit philosophers. And it is his recommendation that we do so if we can.
 
 
 11
 2. The second kind of departmental need is for faculty especially qualified to teach courses in the following areas: a. Applied ethics, especially medical ethics. There is an increasing student demand for such courses and for additional undergraduate course offerings at the Medical School. b. Philosophy of Law. This is one of the most popular of our 300-level course offerings. It needs to be offered annually both at Lake Shore Campus and Water Tower Campus and there seems to be some desire that we offer it annually in the Law School. c. Logic. There is an exceedingly heavy student enrollment at both Lake Shore Campus and Water Tower Campus. Additional sections of courses in logic should be offered on each campus.
 
 
 12
 Consequently, we should seek persons who have special competence and interest in teaching courses in these areas. The Chairman's recommendation is that we seek to hire persons who will help teach in these areas.
 
 
 13
 These two kinds of needs are different though not incompatible. The Chairman's recommendations as to hiring is the following:
 
 
 14
 That for each of these 3 positions we seek to hire a professionally competent Jesuit philosopher--preferably a young Jesuit with competence to teach in one or several of the areas mentioned above.
 
 
 15
 At the November 30 meeting, the following resolution was adopted:
 
 
 16
 That for each of the 3 positions we seek to hire a professionally competent Jesuit philosopher--preferably a young Jesuit with competence to teach in one or several of the following areas: a) applied ethics, especially medical ethics; b) philosophy of law; and c) logic; and that if we should be unable to hire such, we hire temporary full-time person(s) with special competence to teach in one or several of these areas.
 
 
 17
 Plaintiff Pime, a Jew, had been employed in 1976 as a part-time lecturer in the department. He taught several courses. He expected to receive his doctorate in June, 1979 and had received indications of approval of his work. He knew of the resolution of November 30, and asked the department chairman when there would be a full-time tenure track position for him. The chairman said he saw nothing in the way of a position for Pime in the next three or four years. Disappointed, Pime left Loyola after the spring semester.
 
 
 18
 He filed a timely charge of employment discrimination with EEOC and received notice of his right-to-sue. Then he filed this action.[1]
 
 
 19
 There is no hint of invidious action against Pime on account of his religion. The faculty resolution excluded every non-Jesuit from consideration, whether of the Catholic faith or otherwise. We shall assume, however, that because Pime's faith would prevent his being a Jesuit, he has a claim of discrimination on account of religion.
 
 II. BFOQ
 42 U.S.C. Sec. 2000e-2(e)(1) provides:
 
 20
 (e) [I]t shall not be an unlawful employment practice for an employer to hire and employ employees, ... on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.
 
 
 21
 The BFOQ involved in this case is membership in a religious order of a particular faith. There is evidence of the relationship of the order to Loyola, and that Jesuit "presence" is important to the successful operation of the university. It appears to be significant to the educational tradition and character of the institution that students be assured a degree of contact with teachers who have received the training and accepted the obligations which are essential to membership in the Society of Jesus. It requires more to be a Jesuit than just adherence to the Catholic faith, and it seems wholly reasonable to believe that the educational experience at Loyola would be different if Jesuit presence were not maintained. As priests, Jesuits perform rites and sacraments, and counsel members of the university community, including students, faculty, and staff. One witness expressed the objective as keeping a presence "so that students would occasionally encounter a Jesuit."
 
 
 22
 It is true that it has not been shown that Jesuit training is a superior academic qualification, applying objective criteria, to teach the particular courses. It is also true that in looking at claims of BFOQ, courts have considered only the content of the particular job at issue. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985). Yet it seems to us that here the evidence supports the more general proposition that having a Jesuit presence in the Philosophy faculty is "reasonably necessary to the normal operation" of the enterprise, and that fixing the number at seven out of 31 is a reasonable determination.
 
 Judge Leighton found as follows:
 
 23
 Clearly, religion, the fact that the three full-time vacancies were reserved for Jesuits, persons who were Catholics, was the basis for the decision which the tenured faculty made on October 12, 1978, at the general meeting of the Department of Philosophy. In good faith, Loyola, through its tenured faculty in the Department of Philosophy, decided that being a Jesuit, again a matter of religion, was to be required of those who were to fill the three vacancies. This was a bona fide determination of qualification for the position. Finally, the full-time faculty determined that it was necessary for the future of the department, and for Loyola, that a "Jesuit presence" in the university be maintained, and that the designated areas of teaching be done by competent Jesuit philosophers. Therefore, Loyola qualifies for the [BFOQ] exemption....
 
 
 24
 The finding is not clearly erroneous.
 
 
 25
 The judgment appealed from is AFFIRMED.
 
 
 26
 POSNER, Circuit Judge, concurring.
 
 
 27
 I agree that Pime must lose this Title VII case. But my ground is different from and narrower than my brethren's ground, and although not emphasized by the defendant is sufficiently argued that we need not treat it as waived.
 
 
 28
 Pime was turned down for a tenure-track position in Loyola's philosophy department not because he is a Jew, not because he is not a Catholic, but because he is not a member of the Jesuit order. I therefore do not think he has been deprived of an employment opportunity because of his religion. 42 U.S.C. Sec. 2000e-2(a). It is true that you cannot be a Jesuit if you are not a Catholic; but only a tiny fraction of Catholics are Jesuits. If Pime were a Catholic but not a Jesuit he would be just as ineligible for the position as he is being a Jew, yet it would be odd indeed to accuse Loyola of discriminating against Catholics because it wanted to reserve some positions in its philosophy department for Jesuits, thus excluding most Catholics from consideration. Not only is Pime's being Jewish an adventitious circumstance in this case but so is the fact that Loyola is a Catholic school. It is hard to believe that the philosophy department of the University of Chicago--or of Brandeis University--would be guilty of a prima facie violation of Title VII if it reserved a few slots for Jesuits, believing that the Jesuit point of view on philosophy was one to which its students should be exposed; and Loyola should have the same right. To take another example, suppose Loyola reserved a slot for a rabbi, to teach Jewish theology; would this be a prima facie violation of Title VII? I cannot believe it would be; and if this conclusion is right it casts doubt on my brethren's assumption that the mere fact of reserving one or more slots for members of a religious order establishes a prima facie case.
 
 
 29
 Of course my argument would fall to the ground if the Jesuit order were itself a religion within the meaning of Title VII. But the statute seems to use the term in its ordinary sense, see 42 U.S.C. Sec. 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief"), and in ordinary language Jesuits are a Catholic order, not a separate religion.
 
 
 30
 No cases bear directly on my argument but several provide analogies. In General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the Supreme Court held that an employer's denying benefits under its disability plan to women who missed work because of pregnancy was not sex discrimination under Title VII, even though all pregnant persons are female; and while Congress promptly undid the result it did so by a specific grant of rights to pregnant women. See 42 U.S.C. Sec. 2000e(k), added by Pub.L. 95-555, Oct. 31, 1978, 92 Stat. 2076. In holding that voluntary affirmative action for blacks does not always violate Title VII even prima facie, United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), established that not every racial preference is to be equated to a racial exclusion. Granted, the idea behind affirmative action is not to benefit black people per se but to eliminate what are believed to be consequences of past discrimination against blacks; and while there have been times and places where Jesuits were persecuted, sometimes ferociously, Loyola makes no argument for its Jesuit quota on the basis of a history of discrimination. On the other hand the reservation of a few tenure slots for Jesuits in a private university founded by and to some extent still controlled by Jesuits (to what extent I shall consider later) is less offensive than a racial quota in a steel mill or a fire department. And then there is Massachusetts' veterans-preference law, held in Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), not to violate the equal protection clause of the Fourteenth Amendment even though 98 percent of the veterans in Massachusetts were male and, as a practical matter--given past policies toward recruitment of women for the armed forces--it would have been impossible for most women to have become veterans. The equal protection clause, it is true, is limited to intentional discrimination, or as it is sometimes called disparate treatment (these are synonymous terms, see American Nurses' Ass'n v. Illinois, 783 F.2d 716, 722 (7th Cir.1986)), whereas Title VII reaches not only disparate treatment but also disparate impact. But we shall see in a moment that Pime has no disparate-impact claim.
 
 
 31
 Of course if Loyola had reserved the seven slots for Jesuits because it wanted to keep Jews or other non-Catholics out, it would be guilty of discriminating against Pime on religious grounds. But there is no suggestion of pretext. Loyola really does want Jesuits in these positions and really would have turned down--for all we know did turn down--Catholic applicants who were not Jesuits. It thus is not guilty, even prima facie, of intentional discrimination or disparate treatment.
 
 
 32
 Pime has not tried to make out a case of disparate impact. An employment practice that on its face is neutral with respect to matters of race, religion, and sex (for example, a height requirement or an educational requirement) can be invalidated under Title VII upon a showing that it bears disproportionately and unjustifiably on a protected group. See, e.g., Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Certainly the same showing should be good enough when as in this case the criterion for employment, though neither applicable to all slots within the particular employing unit (here the philosophy department) nor stated in terms of adherence to a faith, operates to disqualify all nonadherents (although not all Catholics are eligible, all non-Catholics are ineligible). If Loyola refused to hire any but Jesuits to teach philosophy the effect might well be to exclude Jews and other non-Catholics disproportionately, for only Catholics can be Jesuits. But only seven positions out of 31 are at issue, and while there was testimony that no Jew has ever been hired for a tenure-track position in the philosophy department, Pime has not presented evidence of discrimination against Jews as such. The discrimination is against non-Catholics; but the record is silent on what fraction of the 24 positions not reserved for Jesuits are filled by non-Catholics.
 
 
 33
 As Pime has not made out a prima facie case of discrimination, we need not decide whether Loyola could rebut such a case by proving either that Loyola is a religious employer (the defense that the district court rejected, but that Loyola has renewed on appeal) or that being a Jesuit is a bona fide occupational qualification (the defense that the district court accepted, and that provides the ground of the majority opinion in this court). By treating the case as if it involved Loyola's refusing to consider non-Catholics for the positions in question, yet exonerating Loyola on the basis of the statutory defense of bona fide occupational qualification, my brethren are led to read that defense very broadly. I am not prepared to say that their reading is wrong, but I am troubled by it and would prefer to avoid resting decision on it.
 
 
 34
 The statute allows an employer to employ a person on the basis of his religion "in those certain instances where religion ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. Sec. 2000e-2(e)(1). Loyola wants to reserve seven of 31 tenure slots in the philosophy department for Jesuits, without specifying any subject-matter for the seven. There is no course that it believes only a Jesuit qualified to teach; it wants Jesuits in the department in order to maintain (as my brethren put it) "the educational tradition and character of the institution." Although a worthy objective, this may not create the tight fit that the statute appears to require by the words "reasonably necessary." No doubt it would be nice to have a minimum number of Jesuits in a school with a strong Jesuit tradition but by this type of reasoning the concept of bona fide occupational qualification could expand almost without limit. On the same type of showing made here, a men's clothing store could claim a right to hire only men as salesmen in order to maintain the character of the store, or Ivy League universities the right to maintain a ceiling on the number of Jews in some departments in order to maintain the traditional character of those departments and of the university. Yet such results would be inconsistent with the principle that the defense of bona fide occupational qualification "was in fact meant to be an extremely narrow exception." Dothard v. Rawlinson, supra, 433 U.S. at 334, 97 S.Ct. at 2729. See, e.g., Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 389 (5th Cir.1971).
 
 
 35
 The Senate floor managers had, however, offered as an example of a bona fide occupational qualification "the preference of a business which seeks the patronage of members of particular religious groups for a salesman of that religion," 110 Cong.Rec. 7213 (1964), and maybe an analogy can be drawn to Loyola's desire to maintain a strong Jesuit presence in a philosophy department most of whose students presumably are Catholics, for whom the Jesuit viewpoint on philosophy holds a special interest. Such a stipulation, moreover, is much less offensive than the examples I gave in the previous paragraph. Indeed, I think it is totally inoffensive--but for a reason which demonstrates the strength of my preferred ground for decision. Loyola is not saying that only Catholics may have permanent appointments in its philosophy department or even that seven slots shall be reserved for Catholics; the preference is not for Catholics as such but for persons having a particular training and outlook which entail their being Catholic. The defense of bona fide occupational qualification is narrowly interpreted in part because it is a defense to express discrimination on grounds of religion, sex, or national origin, and Loyola is not guilty of such discrimination.
 
 
 36
 A curious feature of the defense is that like the prima facie prohibition it speaks of "religion" and thus seems to contemplate situations where the preference is for adherents to a particular faith, such as Catholics, rather than members of a particular religious order, such as Jesuits. Contemplating as it does a more far-reaching exemption than needed in this case, it naturally requires a more stringent showing than appropriate for this much milder "discrimination." That is why rather than stretching the exemption I would prefer to interpret the prima facie case more narrowly.
 
 
 37
 If I am wrong in thinking that Loyola is not guilty of prima facie discrimination, I would give serious consideration to interpreting the defense of bona fide occupational qualification broadly enough to reach what Loyola has done, for it seems so remote from any concern that Congress had when it passed Title VII. But it is not necessary to decide whether Loyola has made out this defense and I think it would be the better part of valor to forgo reliance on it and place decision on the narrower ground. For reasons having nothing to do with antipathy to Jews or other non-Catholics, Loyola wants to have a certain proportion of its philosophy professors drawn from a particular religious order to which, as I have said, most Catholics do not belong and could not belong, because they would be either unable to satisfy the demanding entrance requirements or unwilling to take the vows of poverty, chastity, and obedience. In giving a modest and thoroughly understandable preference to members of this order, in circumstances that rebut any inference of invidious discrimination, Loyola is not discriminating against members of any religious faith within the meaning of Title VII.
 
 
 38
 For completeness I will address the other defense pressed by Loyola, the religious-employer defense, which so far as applicable to this case is available to a university that "is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society." 42 U.S.C. Sec. 2000e-2(e)(2). That is an apt description of Loyola as of its founding as St. Ignatius College in 1870. But for many years now Loyola has not been owned by the Jesuit order. It is incorporated not as a religious corporation but as an ordinary nonprofit corporation, and financial contributions from the Jesuit order provide only one-third of one percent of the university's income. Although three-fourths of the students are Catholic, the university does not require students to take any courses in Catholic theology (it does require each student to take three courses in theology, however), does not have a seminary (though it has a theology department), and offers a full range of secular instruction. It is no longer a religious or sectarian school in the narrow sense. All this would matter not at all if it were clear that the board of trustees was controlled by Jesuits, for control in whole or substantial part is all the statute requires. But only a minority of the board are Jesuits. The university's by-laws require that at least one-third plus one of the trustees be Jesuits (in fact 40 percent of the trustees are Jesuits)--enough to block amendments to the by-laws, since such amendments require the approval of two-thirds of the board--and that the president of the university, who has the normal powers of a chief executive officer (the by-laws describe him as the university's "principal executive officer"), be a Jesuit.
 
 
 39
 Is the combination of a Jesuit president and nine Jesuit directors out of 22 enough to constitute substantial control or management by the Jesuit order? There is no case law pertinent to this question; the statute itself does not answer it; corporate-control and state-action analogies (see, e.g., Henn & Alexander, Laws of Corporations and Other Business Enterprises 656, 740 (3d ed. 1983); Powe v. Miles, 407 F.2d 73, 79-83 (2d Cir.1968) (Friendly, J.)) are too remote to be illuminating; and the legislative history, though tantalizing, is inconclusive. The exemption originated in an amendment offered by Congressman Purcell and extensively debated. See 110 Cong.Rec. 2585-93 (1964). The focus of the debate, however, was on the merits rather than the scope of the exemption. One thing that seems reasonably clear from a remark by Congressman Purcell is that the exemption is not limited to schools chartered as religious corporations: "most church-related schools are chartered under the general corporation statutes as nonprofit institutions for the purpose of education." Id. at 2585. Moreover, this and other references to "church-related" and "church-affiliated" schools indicate that Congress did not intend to limit the exemption to schools formally owned by religious bodies--but that is anyway apparent from the language of the exemption. However, the debates did not focus on the question, at what point does the relation between the religious body and the school become so attenuated that the exemption ceases to be available? The suggestion by an opponent of the exemption that any schools "that were connected in the beginning or are still connected with some particular denomination of the Christian faith" would be within the exemption (see id. at 2590) seems deliberately exaggerated. Although Congress seems to have been aware that the degree of religious involvement in universities popularly considered to be religiously affiliated is highly variable, see Moots & Gaffney: Church and Campus: Legal Issues in Religiously Affiliated Education 2 (1979), neither the statute nor the legislative history indicates where in the continuum Congress wanted to make the cut.
 
 
 40
 If the governance arrangements of Loyola are typical of those of Catholic universities, then I would have little doubt that Loyola was within the protection of the religious-employer exemption, but the record contains no information on the matter. They may not be typical; a recent decision concerning a Catholic university in Puerto Rico noted that the university's by-laws required that a majority of the board of trustees as well as the university's president had to be members of the Dominican order. Universidad Central de Bayamon v. NLRB, 793 F.2d 383, 399-400 (1st Cir.1986) (en banc) (opinion for one-half of evenly divided court). If Loyola, perhaps in order to attract financial or other support from non-Catholic sources (cf. Hunt v. McNair, 413 U.S. 734, 743-44, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973); Tilton v. Richardson, 403 U.S. 672, 681, 686-87, 91 S.Ct. 2091, 2099-2100, 29 L.Ed.2d 790 (1971) (plurality opinion); Roemer v. Board of Public Works, 387 F.Supp. 1282, 1287 and n. 7 (D.Md.1974), aff'd, 426 U.S. 736, 755-60, 96 S.Ct. 2337, 2349-51, 49 L.Ed.2d 179 (1976)), has attenuated its relationship to the Jesuit order far beyond that of other Catholic universities, there would be a serious problem in holding that it could nevertheless discriminate freely in favor of Catholics; for remember that the exemption allows the religious employer to confine all hiring to members of one religious faith. But the record is as I have said silent on these questions, which makes me as leery about using this case to determine the scope of the religious-employer exemption as about using it to determine the scope of the exemption for religion as a bona fide occupational qualification. I would avoid both defenses, and place decision on the ground that there was no prima facie violation of Title VII, given the lack of evidence of either discriminatory intention or discriminatory effect.
 
 
 
 [1]
 Even though appellant did not formally apply for a tenure track position no standing question arises. One does not have to apply for a job when it is obvious that it would be a futile act. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Berkman v. City of New York, 705 F.2d 584 (2nd Cir.1983)