Fremont-Smith, J.
This case was triedjury-waived for several days commencing on November 22, 1993, and involves a dispute between sincere, sensitive parties, each of whom is championing important and legitimate issues of public and social concern. On the one hand, the plaintiff, who was refused employment as a Youth Director and as an After-School Director of the Jewish Community Center of Greater Boston (“JCC”) because he is non-Jewish, perceives that he is the victim of invidious religious discrimination,[1] whereas the JCC, whose mission it is to impart Jewish values, history and culture to Jewish children, perceives that, to be effective, such positions must be held by committed, practicing Jews. For the reasons stated below, the Court finds that being a practicing Jew is a bona fide occupational qualification for the positions of Youth Director and After-School Director at the JCC, and concludes that the complaint should accordingly be dismissed.
FINDINGS OF FACT AND RL
Having heard the testimony c having examined the documents e at trial, I make the following h conclusions of law:
Plaintiff Francis “Chip” Piatti (“P Cambridge and a former employe-munify Centers of Greater Boston Catholic, but also has an in-depth pathetic appreciation of Jewish - While at Boston College, Piatti (w: degree in philosophy) studied Hr connection with his courses in theo-liturgical music. In addition to learn Hebrew, he became acquainted w and cultural sensitivities as a r< employment as a Youth Director a*
The JCC is a charitable, non-prc. provides services through local Je\ ters. According to its mission sti purposes are, inter alia, to strength munify, provide “a base for Jewish a ■ contacts at various age levels,” “pr-ciations with Jewish experiences,” “provide Fuming experiences in Jewish values, history, [and] culture,” and “address! ] specific needs of populations within the Jewish community as they seek self-definition as Jews.” Similarly, the JCC’s by-laws[4] provide that the “JCC is dedicated to using its resources and skills to enhance the cultural, physical, and social we; Jews and of the Jewish commum (though not all) of the services arv by the JCC have a Jewish compon services and programs are open tc both Jews and non-Jews. Similar, both Jews and non-Jews in its cent
Piatti was hired as the full-tirm the JCC’s Revere (Metro-North) ft continued in that position, as as until August 1989. During his te youth programs served approximo children ranging from pre-schooi school, in age. His responsibilities ning of both religious and secu supervision of the center’s kosher ¿ vision of part-time instructors, pure and the designing and producing ; tions. There is no indication the these duties in other than a profes
In 1983, the national arm of i committee to make recommendatic imize Jewish education at Jewisl ters. The committee released a repc 1984[5] which concluded that the lo. re-focus their efforts to maximize o the centers. One of the specific recc *384 that local JCCs “set the appropriate climate and develop effective Jewish programs and services” by “hiring Jewishly committed staff and by continuously upgrading their Jewish education level.”
In 1989, the Metro North JCC faced serious budgetary and financial problems. In an attempt to resolve these problems, the JCC board voted to eliminate or reduce many of its programs, and to put greater emphasis, in its remaining programs, on serving the Jewish community. A casualty of this reduction was the youth program which Piatti directed. In place of the broad youth program that Piatti had supervised, the JCC decided to implement a smaller, after-school program primarily for Jewish children, with a stronger Jewish focus. As a consequence, the full-time position of youth director was eliminated and has never been restored.
At the same time, the JCC created a new part-time position to oversee the after-school program at half the amount of his previous salary. Piatti applied for this position, but was rejected in favor of Beth Handren, who is Jewish.[6]
The JCC does not deny that Ratti was rejected for this position because he is not Jewish. Alan Mann, Associate Director of the Boston JCC, testified (as he had at his earlier deposition)[7] that Ratti was not considered qualified for the newly re-focused position because “we needed a much greater emphasis on Jewish identity and Jewish education, and the feeling was Chip not being Jewish and not having a Jewish background that he could share with others from a Jewish perspective made him not appropriate for that program.” Mann testified further that had Ratti been Jewish, the JCC “would have ... a whole different conversation . . . with him ... we would talk about the . . . knowledge that he had with Jewish experiences, Jewish background, and if he passed that, then he would be qualified.”
In November of 1989, Piatti filed a complaint with the Massachusetts Commission Against Discrimination alleging that he had been fired from his full-time job, and had not been hired for the part-time job, because of religious discrimination. He later removed the action to the Superior Court.
In September 1990, Ratti responded to an advertisement in the Boston Globe for a Youth Director position at the Leventhal-Sidman Jewish Center, and applied for that position. Piatti was not offered or interviewed for this position and, upon later inquiry, was told that his resume had been misplaced for about thirty days, during which time the position was filled.
Regardless of whether this explanation is credible (and the court finds it is not) it was clear from the trial testimony that Ratti would not have been hired for the Leventhal-Sidman position in any event, because he is not Jewish. Ratti subsequently amended his complaint to include this event.
In March 1990, the JCC wrote to Ratti advising him that there was a full-time position available in the communications department of the Leventhal-Sidman center for which he was qualified, and inquired whether he was interested.[8] Although the communications job was to pay the same as his former job as Youth Director, Ratti declined to be considered because he wished to work in a child-contact position.
While employed at the Metro-North center, Ratti had been covered by a collective bargaining agreement which applied to all full-time positions (thirty or more hours a week).[9] The agreement provided that “[Tjhere shall be no discrimination against any employees because of sex, race, religion, creed, color, national origin, age, handicap (provided the individual is fully able to perform all the requirements of the job), or Staff Association membership or activity,” and required that, in the event of financial cutbacks, “every effort shall be made to transfer employees to other positions of similar responsibility and salary.” The part-time position, however, for which Ratti was rejected, and which was filled by Beth Handren, was not covered by this agreement. There was no evidence as to whether the Leventhal-Sidman position was covered by the agreement.
Count I — G.L.c. 151B Violations
The plaintiff has the initial burden of showing that he was discriminated against on the basis of race, color, religious creed, national origin, sex, sexual orientation or age. Sarni Original Dry Cleaners, Inc. v. Cooke, 388 Mass. 611, 614 (1983) (“The burden of proof as to the unlawfulness of the challenged act or practice must be carried by the employee”). In the present case, Ratti claims three separate incidents of discrimination: 1. his lay-off from the full-time Youth Director position, 2. the failure of the JCC to hire him for the part-time After-School Director position, and, 3. the failure of the JCC to hire him for the Youth Director position at the Leventhal-Sidman Center. The court addresses each of these incidents in order.
Based on the testimony at trial of Alan Mann, Associate Executive Director of the JCC, the deposition testimony of Bernard Rosen, Executive Director of the JCC,[10] and the JCC Metro North Budget,[11] the Court finds that the original decision to eliminate the full-time Youth Director position was the result of financial considerations and not based on any discriminatory motivation. For this reason, the plaintiff cannot succeed on his G.L.c. 15 IB claim with regard to his initial lay-off.
It is clear, however, that the plaintiff was not offered the newly-created part-time position of After-School Director because he is not Jewish. Additionally, although there is evidence that the Leventhal-Sidman Youth Director position was given to a candidate with more experience than Ratti, it is clear that he would not have been offered the job in any event, because he is not Jewish. I specifically reject as implausible the JCC’s assertion that Ratti’s application for that position was “lost” for thirty days until after the position had been filled by another (Jewish) candidate. Accord *385 ingly, the plaintiff has fulfilled his initial burden of proving that the actions of the JCC, in regard to these incidents, was discriminatory.
Once the plaintiffs initial burden is met, the “burden of production shifts to the respondent to articulate a legitimate, nondiscriminatory reason for its action and to ‘produce credible evidence to show that the reason or reasons advanced were the real reasons.’ ” Sarni Original Dry Cleaners, Inc., 388 Mass. at 615, citing Wheelock College v. Massachusetts Corrun’n Against Discrimination, 371 Mass. 130, 137 (1976).
In the present case, the JCC asserts that Judaism is a bona fide occupational qualification (“BFOQ”), pursuant to G.L.c. 151B,[12] for the positions in question. “A BFOQ is an affirmative defense. The burden of proving the defense is on the employer. The standard is an objective one, and . . . [i]n order to invoke the BFOQ successfully, the employer must show that it has a ‘factual basis for believing that all or substantially all [members of the excluded category] would be unable to perform safely and efficiently the duties of the job involved.’ ” Sarni at 617-18 (citations omitted) (bracketed words in original).
For a number of reasons, the defendant’s reliance on a BFOQ defense presents novel and difficult issues. Aside from Sarni supra, there simply are not many Massachusetts cases examining the BFwQ defense. It is therefore instructive to look to decisions under the analogous provisions of 42 U.S.C. §2000e, et seq., “Title VII,” which contains a BFOQ defense similar to those contained in 151B.[13]
Even looking to the federal decisions, however, there is a noticeable scarcity of applicable holdings. While a BFOQ defense is applicable to religious discrimination cases, “the instances where the exception is actually applied to such a case are few indeed.” Kern v. Dynalectron Corporation, 577 F.Supp. 1196 (N.D.Tex. 1983). This is probably because Title VII (and most analogous state statutes) exempts “religious” organizations entirely from the laws governing religious discrimination in the workplace,[14] and are therefore decided on the basis of the express statutory exemptions. Indeed, G.L.c. 151B has similar provisions (c. 151B, §§1(B) and 4(1A)) but, because the JCC does not restrict its programs to members of the Jewish religion, this court has previously held, in this case, that the JCC cannot invoke the religious exemptions contained in c. 156B. (See this court’s order of March 6, 1993 (Izzo, J.) on defendant’s motion for summary judgment.)
Itis somewhat unusual, then, but not unprecedented, for a court to be presented with a case such as this, where a defendant who does not qualify for a religious exemption, seeks nevertheless to assert a religious affiliation as a BFOQ.[15] There are, however, several cases with facts analogous to those in the case at bar.
The plaintiffs rely on E.E.O.C. v. Kamehameha Schools/Bishop Estate, 990 F.2d 458 (9th Cir. 1993), cert denied in Kamehameha Schools/Bishop Estate v. E.E.O.C., 62 USLW 3113 (Nov. 8, 1993), where a member of the Hawaiian royal family created a trust for the creation of two schools and further provided that “the teachers of said schools shall forever be persons of the Protestant religion.” The plaintiff, a non-Protestant, filed suit under Title VII. The court first found the specific religious exemption inapplicable to the schools, holding that, due to the largely secular nature of the schools, they did not qualify as “religious organizations.”
The court then looked to the schools’ purpose and curriculum and found that the “purpose and emphasis of the Schools have shifted over the years from providing religious instruction to equipping students with ethical principles that will enable them to make their own moral judgments.” Id., at 462. The court further noted that the school taught “a complete array of courses ... all of which are taught from a secular perspective. No effort is made to instruct students in Protestant doctrine . . Id. at 463.
The court then turned to the BFOQ defense and, citing U.A.W. v. Johnson Controls, Inc., 499 U.S. 187 (1991), noted that, to qualify as a BFOQ, a discriminatory job qualification must “affect an employee’s ability to do the job” and “must relate to the ‘essence’ or to the ‘central mission’ of the employer’s business.” Kamehameha, at 465. Based largely on its findings that the Schools had become secular in nature and that no recent effort was made to incorporate the content of Protestantism into classes, the court held the BFOQ defense inapplicable because:
There is nothing to suggest that adherence to the Protestant faith is essential to the performance of this job . . . [The schools] also expect teachers to serve as role models and provide general instructions in morals . . . but do not inquire whether the teachers integrate Protestantism into their teaching. The Schools identify no skills or aptitudes which persons affiliated with the Protestant tradition possess as a class that are essential to the performance of those job functions. Moreover, the record indicates the Protestant affiliation requirement is nominal — if a prospective teacher represents he or she is Protestant, the prospective teacher is presumed able to lead prayers and serve as a moral role model.
Id. at 466 (emphasis added).
For exactly these reasons, however, Kamehameha is factually distinguishable from the case at bar. Here, as evidenced by JCC’s mission statement and bylaws, adherence to and practice of the Jewish faith is considered essential to the performance of the jobs in question. Whereas the schools in Kamahameha had shifted from a predominantly religious to a predominantly secular purpose, the Jewish Community Centers, in accordance with the 1983 national JCC report, have moved in the opposite direction, to place more *386 emphasis than in the past, on the integration of Jewish religion and practice into their programs.
While it is clear that the legal reasoning of Kamehameha is germane, the factual distinction here compels a different result.
The question whether a person’s personal religious convictions and affiliation can constitute a bona fide occupational qualification in order to serve as an effective role model for students was also addressed in Pime v. Loyola University of Chicago, 803 F.2d 351 (7th Cir. 1986). There, the plaintiff was a Jewish professor who sought one of the positions reserved for Jesuit professors. The court, in holding that Loyola University could legally require that a certain percentage of full-time faculty positions in its philosophy department be held by Jesuits, said:
The BFOQ involved in this case is membership in a religious order of a particular faith. There is evidence of a relationship of the order to Loyola, and that the Jesuit “presence” is important to the successful operation of the university. It appears to be significant to the educational tradition and character of the institution that students be assured a degree of contact with teachers who have received the training and accepted the obligations which are essential to membership in the Society of Jesus . . . [I]t is wholly reasonable to believe that the educational experience at Loyola would be different if Jesuit presence were not maintained.
Id. at 353-54. The Court went on to approve the lower court’s ruling that:
[I]t was necessary for the future of the department, and for Loyola, that a “Jesuit presence” in the university maintained, and that the designated areas of teaching be done by competent Jesuit philosophers. Therefore, Loyola qualifies for the [BFOQ] exemption.
Id. at 354 (bracketing in original).
The plaintiff argues that Pirne is distinguishable because, in Pirne, the school had reserved only a percentage of teaching positions for Jesuits, rather than having excluded non-Jesuits entirely from teaching positions. In the case at bar, however, the evidence indicates that the JCC hires non-Jews not only for non-teaching positions,[16] but also for teaching positions which entail no religious component (such as the swimming and karate programs).
Next, plaintiff argues that the positions in question are not directly religious in nature and that the position of After-School Director does not require the employee to partake in any religious activities but only to have knowledge of religious customs and traditions. This, of course, goes to the heart of the matter: whether a strong intellectual knowledge of Judaism is sufficient or whether a personal belief in, and practice of, Judaism, is needed in order to effectively provide “positive associations with Jewish experiences” and “learning experiences in Jewish values, history and culture,” and to provide children with “self-definition as Jews.” (See p.3, supra.) The court finds that, under the particular circumstances presented here, defendants have satisfied their burden of proof that intellectual knowledge of Judaism is not the equivalent of belief, practice and membership in the Jewish religion, and does not suffice as a qualification to impart the experience and values of that religion.[17]
In short, the court finds as a factual matter that the “[members of the excluded category] would be unable ... to perform the duties of the job involved” and that being a believing, practicing Jew does constitute a bona fide occupational qualification for the jobs of Youth Director and After-School Director at the JCC. See: Sarni, 388 Mass. at 618.
Accordingly, judgment shall enter for the defendants on Count I of the complaint.
COUNTS II, III and IV
Counts II, III and IV are duplicative of the claims asserted in Count I of the complaint, except that they allege that defendant’s discrimination also violated c. 93, and 102; c. 12, and 11(1); and the Massachusetts Declaration of Rights, Article I. As a number of recent decisions have made clear, however, G.L.c. 151B provides the exclusive state remedy for employment discrimination in Massachusetts. See, e.g., Serini v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 538, 542-43, rev. denied, 399 Mass. 1105 (1987); Bergeson v. Franchi, 783 F.Supp. 713, 720-21 (D.Mass. 1992); Conway v. Boston Edison Co., 745 F.Supp. 773 (D.Mass. 1990); Bester v. Roadway Express, Inc., 741 F.Supp. 321, 322-33 (D.Mass 1990); Akhtar v. Digital Equipment Corp., 1 Mass. L. Rptr. No. 11, 227 (November 29, 1993); and Titcomb v. Boston Safe Deposit & Trust Co. Inc. & The Boston Co., Inc., No. 92-6585, slip op. at 8-10 (Suffolk Co. June 9, 1993) (Sosman, J.). As noted in Akhtar, supra at 228, “G.L.c. 151B is a comprehensive statute intended to afford a remedy for wrongful discrimination practices in the workplace. Massachusetts prefers such a statute to several remedies which would address an identical wrong.” (Citations omitted.)
For this reason, judgment shall enter for the defendant on Counts II, III and IV of the compláint.
COUNT VI — BREACH OF CONTRACT
The collective bargaining agreement which covered Piatti’s employment as a Youth Director contained three relevant provisions. Section 1.4 of the agreement provided: “There shall be no discrimination against any employees because of sex, race, religion, creed, color, national origin, age, handicap (provided the individual is fully able to perform all the requirements of the job), or Staff Association membership or activity." Section 5.1(B)(4) provided that the JCC may terminate an employee if “The worker shall no longer be required because of agency lack of funds or curtailment of Agency programs . . .” Finally, section 16.1 *387 provides that “In case of retrenchment, reorganization, creation of new positions or contraction of the HCC program involving discharges or layoffs, every effort shall be made to transfer employees to other positions of similar responsibility and salary . . . Any employee who is terminated under this Article will have recall rights to his job before any new employee is hired for it, for one year from the date of his dismissal . . . Failure to accept an offer of recall shall constitute a complete termination of employment.”
With respect to the first of the three alleged discriminatory acts, the court has already found that Piatti’s original termination was due to financial rather than to discriminatory causes. Accordingly, the original termination was in accordance with sections 5.1(B)(4) and 16.1 and not in violation of section 1.4. The original full-time position has not been restored, so recall under section 16(1) is not an issue. The plaintiffs further argument that the initial lay-off was, in any event, violative of the contract because the JCC did not attempt to “transfer” Piatti to another job with similar responsibilities and salary, must also fail because there was no evidence that the Leventhal-Sidman Youth Director Job was available when he was laid off, or that any other job with “similar responsibilities and salary” was then available.[18] With regard to the JCC’s failure to hire Piatti for the part-time After-hours position, no breach of contract was involved because the bargaining agreement only applied to full-time positions.
Accordingly, judgment shall enter for the defendant on Count VI of the complaint.
ORDER
Judgment is ENTERED for the defendant on all Counts of the complaint.

 Count I alleges violations of Massachusetts’ anti- discrimination act, G.L.c. 151B; Count II, violations of the plaintiffs equal rights pursuant to G.L.c. 93, §102; Count III, violations of the state civil rights act, G.L.c. 12, §11(1); Count IV, violations of the Massachusetts Declaration of Rights, Article I; and Count VI, breach of contract, all arising out of the defendant’s lay-off of, and refusal to rehire the plaintiff. Count V, alleging violations of the United States Constitution, has been withdrawn.

 Wintered into evidence at trial as exhibit #1.

 Entered into evidence at trial as exhibit #7.

 Handren had been ¡previously employed by the JCC as a-pteschool teacher, a p^sitAh which was also eliminated as a part of the budgetary problems.

 Entered into evidence at trial as exhibit #2.

 Piatti’s responsibilities at the Metro-North Center had included the design and production of various publications.

 Entered into evidence at trial as exhibit #19.

 Entered into evidence at trial as exhibit #23.

 Entered into evidence at trial as exhibit #3.

 G.L.c. 15 IB, §4 provides, in relevant part, that “It shall be an unlawful practice . . . [f]or an employer . . . because of the race, color, religious creed, national origin, sex, sexual orientation ... or ancestry of any individual... to discriminate against such individual. . . unless based upon a bona fide occupational qualification.”

 Section 2000e-2(e) provides, in relevant portion, that it is not an unlawful business practice to discriminate on the basis of religion, sex or national origin if “religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.’' (Emphasis added.) It might be argued that, based on the emphasized language cited above, Title VU’s BFOQ defense should be more narrowly construed than G.L.c. 151B’s, but Sami makes clear that this is not the case.

 42 U.S.C. §2000e-l provides that: “This subchapter shall not apply to an employer with respect to ... a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion ...”

 An extreme example is Kern, supra where a private company which provided helicopter pilots to guard pilgrims as they marched towards Mecca, required their pilots to convert to the Muslim religion. In those circumstances, where non-Muslim pilots caught flying into Mecca were to be beheaded, the court had little difficulty in finding that a BFOQ defense was applicable.

 Indeed, the plaintiff was offered a full-time non-teaching job.

 In this regard, the court found the testimony of Dr. Daniel Margolis, the defendant’s expert witness in the field of Jewish education, as well the testimony of Alafi iviahn and of Bernard Rosen, to be persuasive.

 JCC did offer plaintiff a communications job with equivalent salary at Leventhal-Sidman, although not contractually obliged to do so.

 He also has a master’s degree in anthropology from Hunter College and has taken graduate-level courses in linguistics and theater at Harvard University and graduate-level courses at the School of Architecture and Design at the Massachusetts Institute of Technology.

 Entered into evidence as exhibit #8.