Mansour **RASUL**, Plaintiff,

v.

**DISTRICT OF COLUMBIA**, et al., Defendants.

Civ. A. No. 85–3255 JHP.

United States District Court, District of Columbia.

March 4, 1988.

Samuel M. Shapiro, Rockville, Md., for plaintiff.

Beverly Lewis, Washington, D.C., for defendants.

## MEMORANDUM OPINION

### JOHN H. PRATT, District Judge.

Plaintiff, a Muslim minister, brings this action against the District of Columbia Department of Corrections ("Department") and one of its officers, charging that the Department denied him a position as prison chaplain because of his religious affiliation. Plaintiff was not considered for this position because of a recently abandoned policy of the Department under which chaplains were recruited and hired on a denominational basis. Plaintiff charges, *inter alia*, that the policy violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as infringing upon his rights under the First Amendment to the Constitution. After reciting the facts of this case, we explain our basis for concluding that defendants' policy violated Title VII's proscription against religious discrimination. We do not reach the First Amendment issue.

## BACKGROUND

Although the salient facts of this case were canvassed in our Memorandum Opinion of November 6, 1986, we restate them here for ease of reference and to incorporate subsequent events. Lorton Reformatory is a large prison compound located in Lorton, Virginia, and administered by the District of Columbia. For years the Department has solicited volunteers to administer to the religious needs of inmates incarcerated at Lorton and at the District of Columbia Detention Facility. In addition, and as explained more fully below, the Department hires chaplains to serve the various sections, or "facilities," within Lorton.[1] These chaplains organize and implement a religious program for those inmates who request such services.

Mansour Rasul is a Muslim minister, or "imam," who has received advanced degrees in both theology and criminal justice. In April 1983, Rasul signed an agreement with the Department authorizing him to provide volunteer services to Lorton inmates. In August of that year, Rasul applied to the Department to fill a chaplain vacancy at the Central Facility in Lorton which had been announced on July 29, 1983. Although the vacancy announcement stated that "[a]ll qualified candidates will receive consideration without regard to ... religion," it nonetheless specified that a "Protestant Chaplain" was being sought. Ex. B to Defendant's Memorandum in Support of Summary Judgment ("Def. Memo"). Moreover, the announcement stipulated that

---

1. The Department of Corrections oversees nine facilities at Lorton in addition to the District of Columbia Detention Facility. At the time the parties' papers were filed, nine chaplains were employed by the Department. Rasul Second Aff. ¶¶ 6, 7. The nine were spread among the following facilities: Maximum Security, Central Facility, Detention Facility, Occoquan Facilities I and II, and Youth Center I and II. *Id.* For present purposes we sometimes refer to all the facilities, including the Detention Facility, as "Lorton."

[a]pplicants must be Ordained Protestant Minister with a Master's of Divinity, as required by the designated Protestant faith. In addition, applicants must have at least three years of specialized experience in planning, directing, and maintaining a Protestant religious program.

*Id.* In a paragraph entitled "Brief Statement of Duties," the announcement explained that the successful applicant would be responsible for "planning, directing and maintaining a total Religious Program for the Central Facility." *Id.* The announcement proceeded to delineate specific duties of the position in terms which, with two exceptions, were not geared to the applicant's particular religious affiliation.[2]

On September 5, 1983, the vacancy announcement was reissued in corrected form to advertise two vacancies instead of one. Of the applicants for these posts, personnel specialists in the Department compiled a list of five applicants deemed qualified. Plaintiff's name did not appear on the list. Defendant James F. Palmer, Director of the Department, reviewed the list and, in November 1983, selected two Protestant ministers to fill the chaplain vacancies. Thereafter, by letter dated January 19, 1984, Palmer notified Rasul that he was not considered for the chaplain positions because "[t]he vacancy announcement specified that the Department was seeking to fill a Protestant Chaplain position," and that "[a]s a Muslim Imam you were not eligible for consideration...." Ex. 2 to Plaintiff's Opposition to Summary Judgment ("Pltf. Opp.").

At the time these two vacancies were advertized, it was the Department's "policy" to recruit chaplains on a denominational basis. Def. Memo at 3. On December 12, 1983, however—one month after the vacancies were filled—Palmer circulated a Department memorandum announcing a "policy of advertising for Chaplain positions on a non-denominational basis." Def. Memo at 4; Def. Memo Ex. L. Pursuant to that policy, three additional chaplain vacancies were announced on July 25, 1984. Plaintiff applied, and was selected to fill one of these positions in October 1984, approximately fourteen months after the denial of his original application. Plaintiff continues to hold this position, and has consistently received superior performance evaluations.

Plaintiff filed an administrative complaint for religious discrimination with the District of Columbia Office of Human Rights in March 1984, and a duplicate complaint with the Equal Employment Opportunity Commission in April 1984. Both administrative agencies found insufficient grounds to support plaintiff's charges. Thereupon plaintiff filed this action, premising his complaint on the aforementioned federal statutory and constitutional grounds in addition to alleged violations of the District of Columbia Human Rights Act, D.C. Code § 1–2501 *et seq.* (1981).[3]

---

**2.** The full text of the description of job responsibilities provided as follows:

Incumbent is responsible for planning, directing and maintaining a total Religious Program for the Central Facility. Specific duties include the following: (1) Establishes regularly scheduled seasonal and occasional services for inmates and offers consolation and services to inmates and their families during times of crisis; (2) Conducts instructional class aimed at developing strong interpersonal relationship with inmates as a [sic] aide in redirection of lives and amelioration of the maladjusted; (3) Participates with the Administrator and other officials in the Department in policy determination with regards to religious activities, matter of freedom of Religion and conscience; (4) Conducts orientation programs for inmates of the designated Faith to interpret for them the role of Religion, ethics, and morals in their rehabilitation; (5) Prepares lectures and addreses for presentation in the community for the purposes of interpreting the role of his/her Designated Religion in the Department as well as the role of the community in relationships to persons convicted of crimes.

Def. Memo Ex. B. Only the final two enumerated duties refer to the "Designated faith" of the applicant.

**3.** Plaintiff's complaint also sought to permanently enjoin defendants from hiring chaplains on a denominational basis. This component of plaintiff's action became moot when the Department implemented a new, non-denominational hiring policy. Thus, plaintiff has withdrawn his claim for injunctive relief.

Defendants filed their first motion to dismiss, or, in the alternative, for summary judgment before the parties had commenced discovery efforts. By Memorandum Opinion and Order dated November 6, 1986, the court denied defendants' motion as to plaintiff's constitutional and federal statutory counts. We concluded that plaintiff had raised a genuine issue of material fact as to whether the denominational hiring of prison chaplains falls within the so-called "bona fide occupational qualification" ("BFOQ") exception to Title VII's prohibition against discriminatory employment practices. 42 U.S.C. § 2000e–2(e)(1). We also refrained from ruling on the constitutional issue, citing the need for a "complete factual record" in First Amendment jurisprudence. Memorandum Opinion at 8 (citing *Karriem v. Barry*, 743 F.2d 30, 40 n. 63 (D.C.Cir.1984)). We dismissed plaintiff's state statutory claim, however, for failure to satisfy jurisdictional prerequisites to maintaining a judicial action under the Human Rights Act. Memorandum Opinion at 9; D.C.Code § 1–2556 (complainant must withdraw complaint from Commission of Human Rights before seeking judicial relief); *Dougherty v. Barry*, 604 F.Supp. 1424, 1442 (D.D.C.1985) (private right of action under Human Rights Act not available to District employee).

After extensive discovery efforts, and development of an equally extensive factual record, defendants have now renewed their request for summary dismissal. We now consider defendants' renewed claims.

## DISCUSSION

■ To establish a *prima facie* case of religious discrimination under Title VII, plaintiff must demonstrate that (1) he belongs to a protected class; (2) he applied and was qualified for the position for which the defendants sought applicants; (3) despite being qualified, his application was rejected; and (4) the position remained open and the defendants continued to seek applications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Defendants argue that as to the 1983 vacancies plaintiff failed to satisfy the second prong of

this test, in that he was not a Protestant minister and did not have at least three years of specialized experience in planning, directing and maintaining a Protestant religious program. This objection does not resolve the present dilemma. The qualifications to which defendants refer are undoubtedly linked to a particular religious affiliation, and are thus on their face violative of Title VII unless defendants can establish an applicable exception to the statute's general proscription against religious preferences in hiring. Courts have recognized that "[t]he mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation." *Garrett v. Okaloosa County*, 734 F.2d 621, 624 (11th Cir.1984); *Edwards v. Department of Corrections*, 615 F.Supp. 804, 809 (M.D. Ala.1985) (quoting language in *Garrett*).

■ Defendants thus rely on the exemption in section 703(e)(1) of Title VII, which provides that

[i]t shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of religion ... in those certain circumstances where religion ... is a *bona fide occupational qualification* reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e–2(e)(1) (emphasis supplied). Defendants submit that affiliation with the Protestant denomination is a BFOQ for employment as a chaplain at Lorton. It is plain from the quoted passage of section 703(e)(1) that the BFOQ exception applies to religious discrimination cases. Although there is a notable paucity of case law confronting this exception in the religious context, those courts that have considered the matter have applied the same principles that govern any other BFOQ claim. *See, e.g., Pime v. Loyola University*, 803 F.2d 351 (7th Cir.1986) (BFOQ exception applies to Jesuit-affiliated university seeking only Jesuits for designated faculty positions); *Abrams v. Baylor College of Medicine*, 581 F.Supp. 1570 (S.D. Tex.1984) (policy excluding Jews from sur-

gical teams sent to hospital in Saudi Arabia does not satisfy BFOQ exception), *aff'd*, 805 F.2d 528 (5th Cir.1986); *Kern v. Dynalectron Corp.*, 577 F.Supp. 1196 (N.D.Tex. 1983) (requirement that pilots required to fly into Mecca, Saudi Arabia convert to Islam satisfies BFOQ exception), *aff'd without opinion*, 746 F.2d 810 (5th Cir. 1984). *See also* 29 C.F.R. § 1605.1 (1987) (statutory framework for evaluating necessity of religious qualifications).

Thus, we begin our analysis well aware that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination" enunciated in Title VII. *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (considering case of alleged sex discrimination). Moreover, defendants, the employers in this case, bear the burden of demonstrating that denominational qualifications for the prison chaplain positions are not only relevant to the job, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), but constitute the very *"essence of the business operation...."* *Diaz v. Pan American World Airways*, 442 F.2d 385, 388 (5th Cir.1971) (emphasis in original), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728 (quoting *Diaz* with approval).

We note, first, that the term "chaplain" has a denominational connotation. A chaplain has been defined as "a minister, priest, or rabbi serving with the armed forces, or in a prison, hospital, etc." *Webster's New World Dictionary* 238 (2d ed. 1972). By definition, a chaplain is first of all a "clergyman." *Id.* On first impression, therefore, it might seem illogical for the District to select prison chaplains on anything other than a denominational basis. Given the widely varying beliefs and practices of the various religious denominations, and the many tenets and ceremonies unique to each, one recoils at the thought of hiring chaplains on a generic basis, without regard to their chosen religious affiliation.

On closer examination of the role played by the Department's prison chaplains, however, it becomes evident that the defendants have not sustained their burden of demonstrating the necessity of a denominational hiring policy. Indeed, a hard look at the realities of the actual practices at Lorton suggests the contrary. First, the nature of the chaplain's duties suggest that an applicant's religious affiliation is, at best, a matter of secondary importance. Lorton chaplains are recruited and hired on a facility-wide basis, and are entrusted with the task of "planning, directing, and maintaining a total Religion program" for all inmates in a particular section who request such services, whatever their respective denominations might be. Def. Memo Ex. B; Mikal Huda Ba'th Aff. 2–3.[4] This does not mean, of course, that chaplains administer to *every* religious need of each inmate within their jurisdiction. As both a volunteer imam and a chaplain, for instance, Rasul has routinely presided over worship services for Lorton's Muslim inmates. On the other hand, he has never, and *could never*, celebrate a Catholic Mass, or perform baptism rites, or conduct a Jewish bar mitzvah ceremony. For such services, bound up as they are in the tenets and customs of their respective religions, chaplains enlist the services of volunteers or other prison employees who adhere to the appropriate faith. Rasul Second Aff. ¶ 5; Def. Reply at 1–2.[5]

Conspicuously absent from the vacancy announcement's list of specified duties is any suggestion that chaplains are to pre-

**4.** Since 1977 declarant Ba'th has been employed by the Department as a chaplain, first at Lorton, and later at the Detention Facility. Ba'th Aff. at 1; Rasul Second Aff. ¶ 8. Prior to taking her present position, Ba'th volunteered her services to the Department for two years. Moreover, Ba'th apparently played a pivotal role in altering the Department's chaplain hiring policy. Given this extensive personal experience with the Department, we find illuminating Ba'th's concurrence in Rasul's description of the Department's hiring policy and the function served by chaplains.

**5.** Although Rasul cannot preside over Protestant religious services, in his present capacity as chaplain he "coordinate[s]" more Protestant prayer sessions than those of any other denomination. Rasul Second Aff. ¶ 8.

side over all services within their jurisdiction, or that their activities are governed by their denominational preferences.[6] In fact the scope of a Lorton chaplain's duties is much broader. Among his manifold responsibilities, a chaplain "[e]stablishes regularly scheduled seasonal and occasional services," but does not necessarily preside over them; "[c]onducts instructional class[es] aimed at developing strong interpersonal relationship[s]"; "[p]articipates ... in policy determination with regards to religious activities"; and "[p]repares lectures and addresses for presentation in the community." Def. Memo Ex. B. One cannot gainsay the importance of such activities to the religious life of an adherent. Defendants have not even hinted, however, that satisfactory performance of these multiple and varied tasks depends upon the chaplain's particular religious beliefs. Indeed, many, if not most, of these functions presumably could be performed by a religious guidance counselor or administrator in lieu of a priest, rabbi, imam or minister.

In defense of its hiring policy, the Department claims that it had to recruit chaplains on a denominational basis "to insure that all of the major religions were represented," and to "adequately accommodate the religious needs of inmates." Def. Opp. Ex. Q (Department's statement before District of Columbia Office of Human Rights); Def. Reply at 2. Whatever the superficial merit of these claims,[7] they obviously failed to impress the Department itself, which abandoned the denominational hiring policy one month after the vacancies at issue were filled.[8] At least one court had noted that "[f]or an occupational qualification to be 'bona fide,' it must be just as valid and necessary one day as it is the next." *Garrett,* 734 F.2d at 624. Even assuming that this is the unusual instance in which a job criteria is a BFOQ one day and not the next, defendants have offered no reason for the dramatic policy reversal. Nor have defendants so much as hinted that the change in policy has in any way hindered their attempts to provide satisfactory religious assistance to Lorton inmates. *Cf. Garrett,* 734 F.2d at 624 (in sex discrimination case involving abandoned rule barring females from employment in correctional facilities, "defendants came forth with no evidence that the use of female correctional officers ... following the regulation change ... has in any way hindered the efficient operation of the Okaloosa County Jail"). Defendants, in short, are apparently at a loss in defending a policy to which the Department itself no longer subscribes.

For these reasons, defendants have not sustained their burden of demonstrating that Protestantism was of the very "essence" of the chaplain positions sought by Rasul. *Dothard,* 433 U.S. at 334, 97 S.Ct. at 2729. Consequently, the aforementioned vacancy announcement is suspect. The text of section 703(e) requires that we analyze the narrow BFOQ exception pursuant

6. The vacancy announcement noted that chaplains "offer[ ] consolation and services to inmates and their families during times of crisis." This passage does not, however, refer to the "designated Faith" of the applicant, nor can it be read to mandate or permit chaplains to perform religious worship services for inmates of varying denominations.

7. It is worth noting, for instance, that of the nine chaplains employed at Lorton at the time the parties' first round of pleadings were filed, *see supra* n. 1, four were Protestants, two were Catholics, one was Islamic, and two (including Rasul) were hired on a "non-denominational" basis. Rasul Aff. ¶ 6. This would suggest that the Protestant denomination was, at the very least, "represented" among chaplains. Meanwhile, the Department lists no Jewish clergy among its chaplains, suggesting, if nothing else, that at least one "major religion" has not been "represented" on the prison's employment rolls. The Department's policy might stand on more solid ground if it claimed to recruit chaplains in some proportion to the denominational breakdown of Lorton inmates. The Department does not make such a claim; indeed, defendants insist that "the number of Muslim inmates has absolutely no bearing on claims asserted by the plaintiff," himself a Muslim. Defendant's Reply at 3 n. 2. We are entitled to assume, then, that the number of Protestant inmates in the Central Facility and in the entire Lorton population was equally irrelevant to prison hiring decisions.

8. Defendant Palmer virtually conceded both the inappropriateness of the Department's former policy and the propriety of the present regime, noting in his letter to Rasul that the Department has "remedied this situation" by abandoning the denominational hiring policy. Pltf. Opp. Ex. 2.

to a "business *necessity* test, not a business *convenience* test." *Diaz*, 442 F.2d at 388 (emphasis in original); 42 U.S.C. § 2000e–2(e)(1). Despite broad-based discovery and the filing of two potentially dispositive motions, defendants have yet to demonstrate the necessity for their hiring policy, nor have they articulated any weighty basis for preferring certain denominations over others in prison hiring decisions. Put somewhat bluntly, we are unaware that Protestant inmates are going hungry for want of religious guidance, or that the current non-denominational hiring policy has had any appreciable effect, either positive or negative, on the religious life of Lorton inmates.

At the risk of repetition, we pause here to emphasize the narrowness of our holding. Our conclusion, simply put, is that defendants have not and cannot demonstrate that at the time Rasul first applied for chaplain vacancies Protestantism was a BFOQ for satisfactorily filling those positions. We also note the limited effect of this decision; we have no occasion to order the District to alter its hiring policy, for it has already done so. (The Department has, to use Palmer's own words, "remedied this situation." Pltf. Opp. Ex. 2.) Finally, we expressly do not foreclose the possibility that denomination might well have been, and may someday or somewhere be, a BFOQ for prison chaplains. Indeed, one can well imagine contexts in which religious affiliation might prove fundamentally relevant to a chaplain hiring policy. But the same cannot be said in the present context, in which the policy which served to foreclose Rasul from consideration for a chaplain post was soon thereafter discarded with no noticeable impact on the religious life of inmates.

Because we find defendants' former hiring policy violative of Title VII and subject to no saving exception thereto, we have no occasion to pass on plaintiffs' constitutional challenge.[9] Moreover, because there remain no unresolved material issues of law or fact as to liability, we need not defer disposition until trial or until plaintiff files its own dispositive motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte* "). The sole remaining issue in this case is that of the amount of damages to be awarded Rasul. The parties have not briefed or argued this issue, and thus we cannot determine appropriate figures at this time. There is no evidence or allegation of animus on defendants' part, and thus we need not delve into the government's intent in refusing to hire Rasul. Instead, we will await briefing by the parties on the issue of damages resulting from defendants' discriminatory hiring.

An order consistent with the foregoing has been entered this day.

---

**9.** Principles of prudence and judicial restraint dictate that we refrain from passing unnecessarily on constitutional issues, particularly when the issues presented can be resolved on statutory grounds. *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997–98, 86 L.Ed.2d 664 (1985); *Harris v. McRae*, 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980).