Mildred M. **KERN**

v.

**DYNALECTRON CORPORATION.**

Civ. A. No. 4–79–346–K.

United States District Court,
N.D. Texas,
Fort Worth Division.

Oct. 19, 1983.

---

Art Brender, Fort Worth, Tex., for plaintiff.

Robert M. Martin, Jr., Storey, Armstrong, Steger & Martin, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

BELEW, District Judge.

Wade Kern filed this religious-discrimination suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e–17 (1976) against Dynalectron Corporation. Since filing, Wade Kern died and his wife Mildred Kern was properly substituted as Plaintiff by an Order signed on September 25, 1980.

42 U.S.C. § 2000e–5 (Title VII), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights actions) all confer jurisdiction upon this Court over the subject matter involved herein. Plaintiff is a resident of Fort Worth, Texas and Defendant is a Delaware corporation. Thus, this Court has jurisdiction over the persons involved pursuant to 28 U.S.C. § 1332, diversity of jurisdiction. The parties stipulate that Defendant is an employer within the definition of Title VII, 42 U.S.C. § 2000e(b).

The case was tried before the Court without a jury. Having heard and considered all the evidence presented at trial and the arguments and briefs of the parties, the Court now enters its opinion and judgment.

On August 17, 1978, Wade Kern entered into a written contract of employment with the Defendant, Dynalectron Corporation, to perform duties as a helicopter pilot. Defendant was under a subcontract with Kawasaki Heavy Industries, Limited, to provide pilots to work in Saudi Arabia. The work to be performed in Saudi Arabia consisted of flying helicopters over crowds of Moslems making their pilgrimage along Muhammad's path to Mecca. The purpose of these flights was twofold: to protect against any violent outbreaks and to help fight fires. Apparently, while en route to Mecca, the marchers lived in tents. Frequently, fires would erupt as a result of

cooking over fires which were started too close to the tents.

Three bases were established for Dynalectron's pilots: at Jeddah, Dhahran, and Riyadh. Those pilots who were stationed at Jeddah would be required to fly into the holy area, Mecca. Saudi Arabian law, based upon the tenets of the Islamic religion, prohibits the entry of non-Moslems into the holy area, Mecca, under penalty of death. Thus, Dynalectron, in accordance with its contract with Kawasaki, requires all pilots stationed at Jeddah to be (or become) Moslem. Had Wade Kern continued to work for Dynalectron, he would have been based in Jeddah and, therefore, his conversion from Baptist to Moslem would have been required.

Such a conversion was not unusual for pilots flying for Dynalectron. In fact, the Defendant regularly sent pilots to indoctrination courses where they were taught the basic formulation of the Islamic faith, converted thereto, and received a certificate manifesting said conversion. Wade Kern went through such a course which was taught in Tokyo, Japan, chose his new Islamic name, signed his certificate of conversion and then changed his mind about his conversion. At that point Kern returned to Fort Worth at his own expense and told Defendant of his decision. Defendant later offered Kern a job as a member of the air crew, a position not requiring his conversion. However, Kern declined to take that job.

■ Within one hundred eighty days after Kern left the Defendant's employ on September 4, 1978, Kern filed a sworn complaint with the Equal Employment Opportunity Commission alleging that he was denied an employment opportunity with Defendant due to its discrimination against him because of his religious beliefs. On July 6, 1979, the Equal Employment Opportunity Commission issued Kern a right to sue letter and Kern properly filed suit in this Court within the following ninety-day period.

To establish a prima facie case of discrimination based on Title VII, Plaintiff

Kern has the initial burden of pleading and proving: (1) Wade Kern's bona fide belief that conversion to Islam is contrary to his religious faith; (2) that he informed his employer of his beliefs; and (3) he was discharged because of his refusal to convert. Although Kern was not actually fired from his job, both Kern and Dynalectron understood that the job required Kern's conversion. Kern refused to continue working for Dynalectron because he did not want to be a Moslem. Had he not quit, however, Dynalectron would have fired him from this job since it required his conversion. Therefore, this Court holds that Kern was constructively discharged. *Anderson v. General Dynamics Convair, etc.*, 589 F.2d 397 (9th Cir.1978), *cert. denied sub nom.; Brown v. General Motors Corp.*, 601 F.2d 956, 959 (8th Cir.1979); *Brener v. Diagnostic Center Hospital*, 671 F.2d 141 (5th Cir.1982). Plaintiff here has established a prima facie case.

■ After the Plaintiff in a case such as this has proved his prima facie case by a preponderance of the evidence, the burden shifts to the Defendant. The United States Supreme Court, in a case vacating a Fifth Circuit opinion which misconstrued the defendant's burden, stated:

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.... We have stated consistently that the employee's prima facie case of discrimination will be rebutted if the employer articu-

lates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 and 257, 101 S.Ct. 1089, 1094 and 1095–1096, 67 L.Ed.2d 207 (1981) (footnotes omitted). Thus, the burden that shifts to the defendant after the plaintiff has proven the prima facie case is one of production, not persuasion. The burden of persuasion never leaves the plaintiff regardless of the intermediate shifts in the burden of production.

■ One of the several ways in which the defendant can carry this secondary burden is by establishing that the discrimination was not unlawful since religion may be a bona fide occupational qualification (B.F.O.Q.).

The B.F.O.Q. defense is set forth in § 703(a) of Title VII:

Notwithstanding any other provision of this title ... it shall *not* be an unlawful employment practice for an employer to hire and employ employees ... on the basis of religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

This defense has properly been construed by the cases as a narrow exception in order to avoid the situation where the exception swallows the rule.

In *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228, at 235 (5th Cir.1969), the Court stated: "We hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." The Court went on to find that the defendant, employer had failed to meet this burden and therefore could not make use of the B.F.O.Q. exception. Also note that in *Weeks*, the case concerned sex discrimination, but the plain language of the B.F.O.Q. exception makes it equally applicable to religious discrimination.

In *Diaz v. Pan American World Airways*, 442 F.2d 385 (5th Cir.1971), the Court looked to the primary function of the employer's business to judge whether or not the B.F.O.Q. defense could properly be utilized. "The use of the word 'necessary' in section 703(e) requires that we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively." 442 F.2d at 388 (emphasis in original). The Fifth Circuit held that the primary function of an airline is the safe transportation of passengers and, thus, hiring females exclusively as stewardesses could not properly fit into the B.F.O.Q. exception. That is, hiring male stewards would in no way undermine the essence of providing safe air transportation.

The United States Supreme Court has referred to the B.F.O.Q. defense as "an extremely narrow exception to the general prohibition of discrimination." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977). However, the Court went on to find that this exception was applicable in the *Dothard* case and, thus, exclusively male "correctional counselors in a 'contact' position in an Alabama male maximum-security penitentiary" was legal discrimination pursuant to the B.F.O.Q. exception. 433 U.S. at 337, 97 S.Ct. at 2730.

Two cases have upheld the use of the B.F.O.Q. exception in instances where the safety of third parties might be risked if the exception were not used. That is, the discriminatory acts were allowed to stand since preventing the discrimination in these cases would result in the diminished safety of third parties. Both of these cases involved the Age Discrimination in Employ-

ment Act of 1967, 29 U.S.C. § 621–634 (1967) which contains a B.F.O.Q. exception that is identical to the one in Title VII.

In *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir.1974), the Court upheld a Greyhound policy of limiting new applicants for jobs as drivers to people under age thirty-five. The dispositive factor was the increased risk to Greyhound passengers if the policy were not upheld. "Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." 499 F.2d at 863. See also a similar case: *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir.1976).

The case presently in issue is unique in several respects: it concerns the possible application of the B.F.O.Q. exception to a *religious* discrimination case and it involves the safety of the employee only, not that of third parties. Clearly, Title VII makes the B.F.O.Q. exception applicable to religious discrimination cases. However, the instances where the exception is actually applied to such a case are few indeed.

In the instant case, discrimination exists: only pilots who either already are Moslem, or those who convert thereto, can be hired to fly from the Jeddah base into the holy area. Since all pilots stationed at Jeddah would be required to fly into Mecca, all of them must be Moslem. This Court as a factfinder holds that regardless of the exact moment Wade Kern found out about the requirement that he convert, he continued to perform his duties under the contract by travelling to Japan solely for the purpose of attending the indoctrination sessions and completing his conversion to the Islamic faith. Further, when Wade Kern changed his mind about the conversion and returned to Fort Worth, he knew he could no longer keep his job flying out of Jeddah since he was not a Moslem. Plaintiff, upon his return to Texas, informed his supervisor, Mr. Zedikee that he could not convert to the Islamic faith in good conscience. As a non-Moslem, he could no longer hold the job that he had with Dynalectron. Dynalectron offered him a different job which started some months in the future which Kern declined to accept. Thus, the elements of Kern's prima facie case are established.

The Defendant's burden of producing a legitimate reason for the existing discrimination is properly sustained through the application of the B.F.O.Q. exception to Kern's case. By applying the standard set forth in *Weeks,* this Court holds that Dynalectron has proven a factual basis for believing that *all* non-Moslems would be unable to perform this job safely. Specifically, non-Moslems flying into Mecca are, if caught, beheaded.

In the language used in *Diaz,* the essence of Dynalectron's business is to provide helicopter pilots. In this instance, under a subcontract with Kawasaki Heavy Industries, the Defendant had to provide Moslem pilots for the Jeddah base. Specifically, the subcontract dated August 28, 1977, required that Moslem pilots and mechanics be provided as necessary for operations in the holy area of Saudi Arabia. Thus, the essence of Dynalectron's business would be undermined by the beheading of all the non-Moslem pilots based in Jeddah.

As to the second unique aspect of this case, the fact that the safety of the employee is in jeopardy instead of the safety of third parties as was the case in *Greyhound,* this application of the B.F.O.Q. may be new, but it is certainly not without some precedent.

The specific facts of this case, *e.g.* where the safety of the employee requires the existence of religious discrimination, can be analogized to the often discussed situation involving discrimination against women of child-bearing age in order to protect the safety of their unborn children. The latter situation is a much harder one in which to apply the B.F.O.Q. exception since proof that a toxic environment directly harms women in this age group and not male workers who might father children is lack-

ing. Thus, the discrimination against women hired to work in a toxic environment in favor of men would be hard to justify without a showing that men working in that environment are less apt than women to produce abnormal children. See: Comment, *Employment Rights of Women in the Toxic Workplace*, 65 Calif.L.Rev. 113 (1977). However, no such problem exists in applying the B.F.O.Q. exception to the instant case.

There can be no question but that non-Moslem pilots stationed in Jeddah are not safe as compared to Moslem pilots. Therefore, Dynalectron's discrimination against non-Moslems in general, and Wade Kern specifically, is not unlawful since to hire Moslems exclusively for this job "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business," § 703(a) of Title VII. Notwithstanding the religious discrimination in this case, the Court holds and finds that the B.F.O.Q. exception is properly applicable.

There are cases which hold that mere stereotypic impressions of male and female roles or customer preferences of one gender over the other are not enough to justify discrimination as a B.F.O.Q., *City of Los Angeles Dept. of Water v. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978); *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir.1971), *cert. den.*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). It is also true that the same maxims are equally applicable to religious discrimination. That is, mere customer preference of one religion over another is not enough to raise religious discrimination to the level of B.F.O.Q. However, as is more fully explicated below, the case at bar is distinguishable from the customer preference cases.

Plaintiff would have this Court follow *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir.1981) wherein it is stated: "No foreign nation can compel the non-enforcement of Title VII here." While this Court agrees with that statement and with its application to the *Fernandez* case, it is not applicable to the case at bar. In *Fernandez*, a female plaintiff sued her employer for discriminatorily not promoting her because she was female. The job to which she would have been promoted required her to deal with South American businessmen who preferred not to do business with females. There, the Court stated that the mere fact that it was an international case did not distinguish it from other cases (cited in the previous paragraph of this opinion) wherein it was held that mere customer preference would not justify the use of the B.F.O.Q. exception. Thus, the Ninth Circuit held that the District Court erred in finding that being male was a B.F.O.Q. in this instance. This Court distinguishes the instant case from *Fernandez*.

First, the Court of Appeals in *Fernandez* upheld the District Court's main finding that Ms. Fernandez was not promoted because she was not qualified: "Testimony was presented that Fernandez was not proficient in the English language ... she had no secondary education ... she had a drinking problem and erratic work habits ... she was indiscreet in her criticism of [her boss] ... and ... she had exhibited poor supervisory and marketing skills." 653 F.2d at 1275. Therein lies the basis for the District Court's opinion and the Ninth Circuit's affirmance. The District Court held only alternatively that being male was a B.F.O.Q. for this job. That portion of the opinion referring to whether or not being male was a B.F.O.Q. was not dispositive of the case and it was only that part of the lower Court's opinion which was overturned. Thus, the comments of the Ninth Circuit are for the purpose of clarification and do not control the overall decision of the Court.

Second, *Fernandez* was a typical customer preference case; whereas the suit presently before the bar is simply not a customer preference case, typical or otherwise. In *Fernandez*, simple male chauvinism prevented the South American businessmen from dealing with females:

Testimony in the record indicated that a female would have difficulty in conducting business in South America from a hotel room. No proof was adduced, how-

ever, that the position required work of this nature. Nor does the record provide any basis for the district court's findings that hiring Fernandez would "destroy the essence" of Wynn's business or "create serious safety and efficacy problems." *There is, in short, no factual basis for linking sex with job performance.* The BFOQ finding is accordingly factually erroneous.

653 F.2d at 1276 (emphasis added). The Court there relied on the fact that being female had not been shown to adversely affect job performance. Thus, it could not be claimed that gender was a B.F.O.Q. for this job.

Unlike *Fernandez*, the case at bar contains ample facts upon which the Court may base its conclusion that being a Moslem was a B.F.O.Q. for this job. Stated another way, it is clear from the evidence adduced at trial that being Moslem was linked to job performance. In fact, as has been stated before, an absolute prerequisite to doing this job (flying helicopters into Mecca) is that one be a Moslem.

As to the statement contained in *Fernandez* that no foreign nation can compel the non-enforcement of Title VII here, this too is inapplicable to the present case. Title VII was written with a B.F.O.Q. exception which was clearly applicable to religious discrimination. Merely by using this exception and applying it to the instant facts, this Court is not engaging in the non-enforcement of Title VII. It clearly is applying Title VII's B.F.O.Q. exception as it was intended to be applied (*i.e.* in those limited instances where one must tolerate religious discrimination where it is a necessity, in fact, a prerequisite for the performance of a job). Thus, this Court is in no way allowing a foreign nation, here Saudi Arabia, to compel the non-enforcement of Title VII in this country.

■ The second count in Kern's complaint is one against Dynalectron for breach of its employment contract. Plaintiff asserts that the contract does not specifically require the employee to be a Moslem and, thus, because Dynalectron failed to keep him on as an employee after he

decided not to convert, it breached its contract with him.

However, based upon the facts that Kern was fully aware of the requirement that he convert and that he started to perform under the contract by attending the indoctrination sessions in Japan, this Court holds that he is now estopped from denying that he either knew or assented to the requirement that he convert to the Islamic faith in order to get the job. Moreover, it was Kern who failed to meet the known requirement that he convert; thus, Dynalectron in no way breached its contract with him.

Therefore, this Court concludes that Dynalectron did not breach its contract with Wade Kern.

## FINDINGS OF FACT

1. Plaintiff, Mildred M. Kern, is a female citizen of the United States and a resident of Fort Worth, Tarrant County, Texas.

2. Defendant, Dynalectron Corporation, is a corporation incorporated under the laws of the State of Delaware, and is doing business in Fort Worth, Tarrant County, Texas.

3. Plaintiff has taken the necessary steps to confer jurisdiction upon this Court. Plaintiff, Mildred M. Kern, was duly appointed Executrix of the Last Will of Wade C. Kern and as the qualified Executrix of Mr. Kern's Last Will was duly substituted as Plaintiff in place of Wade C. Kern on September 25, 1980, by order of this Court.

4. Wade C. Kern (hereinafter "Kern") on or about August 7, 1978, entered into a written contract of employment with Defendant Dynalectron Corporation.

5. Pursuant to the employment contract with the Defendant Corporation, Kern commenced duty as a helicopter pilot and began training under the direction of the Defendant.

6. Kern was to perform duties as a helicopter pilot in the country of Saudi Arabia.

7. Defendant informed Kern prior to his departure for Tokyo, Japan, that a portion

of Saudi Arabia was within the Holy Area surrounding Mecca, located within Saudi Arabia and that it was required by the laws of Saudi Arabia that any person entering the Holy Area be of the Islamic faith.

8. The employment contract of August 7, 1978, specifically refers to compliance with the laws and regulations of the country where services were to be performed.

9. Kern was aware of the religious laws of Saudi Arabia and that he would be required to perform some duties within the Holy Area.

10. The Contract of Agreement Heli-1 between the Minister of Interior, General Civil Defense Administration, the Kingdom of Saudi Arabia and Kawasaki Heavy Industries, Limited, required that Moslem pilots and mechanics be provided as necessary for operations in the Holy Area of Saudi Arabia.

11. Defendant is a subcontractor of Kawasaki Heavy Industries, the primary contractor with the government of Saudi Arabia, for the maintenance and operation of helicopters within Saudi Arabia. Defendant's subcontract specifically requires:

> "Moslem pilots and mechanics shall be provided as necessary for operations in the Holy Area."

Kern was well-aware of this requirement.

12. Following his Islamic conversion in Tokyo, about noon on September 3, 1978, Kern changed his mind at about midnight that same day and returned to Fort Worth, Texas, and advised Defendant that he had changed his mind about employment in a pilot's position for Saudi Arabia.

13. Kern inquired with Defendant about other openings for air crews. He was advised by Defendant that he could be employed in January, 1979, in an air crew position not requiring the Moslem faith. Kern demanded that he be kept on the payroll of Defendant until such time, which action Defendant declined to take.

### CONCLUSIONS OF LAW

1. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law, the same are adopted and are incorporated by reference herein.

2. The Court has jurisdiction over the subject matter of the suit by virtue of 42 U.S.C. § 2000e–5 and by 28 U.S.C. §§ 1331 and 1343.

3. Defendant corporation operates and maintains a business and is an employer within the meaning of 42 U.S.C. § 2000e(b) in that the company is engaged in an industry effecting commerce and employs at least fifteen persons.

4. Defendant requires for employment that an individual be a Moslem to perform the duties of helicopter pilot in certain portions of Saudi Arabia.

5. The requirement that an individual be a Moslem to perform the duties of a helicopter pilot in certain portions of Saudi Arabia is a bona fide occupational qualification within the meaning of 42 U.S.C. § 2000e–2(e).

6. Kern voluntarily and unilaterally rescinded his agreement to work for Defendant and thus breached his obligation under the contract.

Judgment will be entered in accordance with this Memorandum Opinion.