**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,**

v.

**KAMEHAMEHA SCHOOLS/BISHOP
ESTATE, Defendant.**

**Civ. No. 90–539 ACK.**

United States District Court,
D. Hawaii.

Aug. 1, 1991.

**1318**

John de Pemberton, Jr., Stephen Passek, E.E.O.C., San Francisco Dist. Office, San Francisco, Cal., for plaintiff.

Watanabe Ing & Kawashima, James Kawashima, Cynthia Winegar, Colleen I. Wong, Sr. Counsel, Kamehameha Schools/Bishop Estate Legal Dept., Honolulu, Hawaii, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KAY, Chief Judge.

### I. INTRODUCTION

EEOC and Kamehameha Schools/Bishop Estate (KSBE) bring motions for summary judgment. For the following reasons, the court grants KSBE's motion and denies EEOC's motion.

### II. FACTS

The will of Bernice Pauahi Bishop established Kamehameha schools. The will required that teachers at the school be Protestants. Carole Edgerton responded to an advertisement offering a teaching position at KSBE. She was told of the religious qualification. She was not Protestant. She filed a charge of discrimination with EEOC. EEOC found that Edgerton was discriminated against on the basis of her religion which was in violation of Title VII of the Civil Rights Act of 1964. EEOC attempted to conciliate the matter with KSBE but was told that KSBE could not do so because of the directive in Mrs. Bishop's will. EEOC then filed this lawsuit. Both parties have filed motions for summary judgment on the issue of whether KSBE is exempt from Title VII's prohibition against hiring based on religion. Both parties have agreed that the scope of this lawsuit is limited strictly to the kindergarten through twelfth grade teaching positions at the Kamehameha Schools (exclusive of the adjunct schools at other sites).

### III. DISCUSSION

#### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Id.* at 322, 106 S.Ct. at 2552.

If the party moving for summary judgment meets its initial burden of identify-

ing for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment.

*T.W. Electrical. Serv. v. Pacific Elec. Contractors Assoc.,* 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). Instead, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, " *'specific facts* showing that there is a genuine issue for trial.' " *Id.* (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). At least some " 'significant probative evidence tending to support the complaint' " must be produced. *Id.* (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Id.*

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Moreover, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). Indeed, "if the factual context makes the non-moving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (citing, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Service,* 809 F.2d at 630–31.

## B. THE MERITS

This lawsuit arises out of a provision in the will of Mrs. Bishop. It provides that:

I give, devise and bequeath all of the rest, residue and remainder of my estate ... unto the trustees below named ... to hold upon the following trusts, namely: to erect and maintain ... schools ... called the Kamehameha Schools.... I desire my trustees to provide first and chiefly a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women; and I desire instruction in the higher branches to be subsidiary to the foregoing objects. ... I also direct that the teachers of said schools shall forever be persons of the Protestant religion, but I do not intend that the choice should be restricted to persons of any particular sect of Protestants.

Mrs. Bishop's will, ¶ 13 (exhibit 1 of Winegar affidavit filed April 5, 1991).

KSBE apparently concedes that the "Protestant-only" hiring requirement is discriminatory and otherwise would be in violation of the Civil Rights Act of 1964;[1] however, KSBE argues that its "Protes-

---

1. Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), states that:

   [i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire

... any individual, or otherwise to discriminate against any individual with respect to ... employment, because of such individual's ... religion....

tant-only" hiring requirement is exempted from the Civil Rights Act under three code sections: 42 U.S.C. § 2000e–2(e)(1); 42 U.S.C. § 2000e–1; and 42 U.S.C. § 2000e–2(e)(2).

### 1. Bona Fide Occupational Qualification; 42 U.S.C. § 2000e–2(e)(1)

■ Section 703(e)(1) of Title VII of the Civil Rights Act of 1964 is codified at 42 U.S.C. § 2000e–2(e)(1) and provides that

> it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his religion ... in those certain instances where religion ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

EEOC argues that the "Protestant-only" hiring requirement for teachers is not a bona fide occupational qualification (BFOQ) within the meaning of Section 703(e)(1).[2] KSBE argues that it is.

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *International Union UAW v. Johnson Controls,* —— U.S. ——, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991) (sex discrimination); *see also Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (sex discrimination); *Rasul v. District of Columbia,* 680 F.Supp. 436, 440 (D.D.C.1988) (religious discrimination); *Kern v. Dynalectron Corp.,* 577 F.Supp. 1196, 1199 (N.D.Tex.1983), *aff'd,* 746 F.2d 810 (5th Cir.1984) (religious discrimination).[3] "[I]n order to qualify as a BFOQ, a job qualification must relate to the 'essence' or to the 'central mission of the employer's business.'" *Johnson Controls,*

111 S.Ct. at 1205. The Court, in examining the language of the BFOQ exception, noted that it suggested that discrimination "must relate to ability to perform the duties of the job." *Id.* at 1206.[4]

The parties prepared a stipulation regarding this exemption. The stipulation provides "the KS/BE contends that the Will of Mrs. Bishop by its language creates a [BFOQ] for all teachers to be of the Protestant religion in order that there be a Protestant presence" at the schools. *See* Stipulation regarding BFOQ affirmative defense, at ¶ 2a. The stipulation further provides that

> KS/BE is not contending that, apart from their status as teachers generally, there is anything specific about the subject matter of any given teacher position (such as English, science, mathematics) ... that would make a teacher being Protestant a [BFOQ] within the meaning of this exemption.

*Id.*

The court construes the stipulation to mean that, although there is not anything specific within the subject matter of the teachers' position (i.e., math, English, science, etc.) that would justify limiting teachers to Protestants, there is nothing within the stipulation that would prohibit the court from finding that a "Protestant presence" or Protestant perspective was a valid BFOQ based on their status as teachers generally and under the will of Mrs. Bishop. It was the understanding of the court, based on the hearing, that the parties concurred that this was the proper interpretation of the stipulation.

---

**2.** EEOC concedes, however, the requirement is bona fide as to those teaching positions at the school where the teachers actually are teaching a religion class, or to the positions of chaplin and associate chaplin. *See* "stipulation regarding 'BFOQ' affirmative defense."

**3.** *Kern* noted that the "plain language" of the BFOQ exception, which applies equally to sex and religious discrimination, makes caselaw discussing the BFOQ exception in the context of sexual discrimination equally relevant and applicable to religious discrimination. 577 F.Supp. at 1199.

**4.** The Statute thus limits the situations in which discrimination is permissible to "certain instances" where ... discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each of these terms—certain, normal, particular—prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes.
111 S.Ct. at 1204.

KSBE contends that a "Protestant presence" at the school is a valid BFOQ because such presence is important to the successful operation of the schools. KSBE relies on *Pime v. Loyola University of Chicago*, 803 F.2d 351 (7th Cir.1986), for this proposition.

In *Pime*, the Seventh Circuit held that Loyola University's decision to seek Jesuit philosophy professors because it wanted a "Jesuit presence" on campus was not a violation of Title VII. The court held that such a qualification was a valid BFOQ.

Loyola University had a long Jesuit tradition. Until 1970, it was governed by an all-Jesuit board of trustees. In 1970, the by-laws were amended allowing nearly two-thirds of the trustees to be non-Jesuits. In 1986, 93% of the academic administrators, and 94% of the teaching staff were non-Jesuit. About 75% of Loyola's students came from Catholic backgrounds. In 1978, Pime was a part-time philosophy professor at Loyola who was Jewish. The philosophy department consisted of 31 professors, 4 of which were Jesuits. The university had three full-time teaching positions in its philosophy department to fill. The University decided that it wanted to fill the 3 positions with Jesuits. Pime applied for and was rejected for the position. He sued.

> The court held that the Jesuit "presence" is important to the successful operation of the university. It appears to be significant to the educational tradition and character of the institution that students be assured a degree of contact with teachers who have received the training and accepted the obligations which are essential to membership in the Society of Jesus. It requires more to be a Jesuit than just adherence to the Catholic faith, and it seems wholly reasonable to believe that the educational experience at Loyola would be different if Jesuit presence were not maintained.... One witness expressed the objective as keeping a presence "so that students would occasionally encounter a Jesuit."
>
> It is true that it has not been shown that Jesuit training is a superior academic qualification, applying objective criteria, to teach the particular courses. It is also true that in looking at claims for BFOQ, courts have considered only the content of the particular job at issue. [citation] Yet it seems to us that here the evidence supports the more general proposition that having a Jesuit presence in the Philosophy faculty is "reasonably necessary to the normal operation" of the enterprise, and that fixing the number at seven out of 31 is a reasonable determination.

803 F.2d at 353–54. The *Pime* court's test to determine whether a BFOQ is valid rests on a finding that the "presence" was significant to the educational tradition and character of the institution, and that it would be reasonable to believe that the educational experience would be different if the presence were not maintained.

Applying the *Pime* test, it is clear that the "Protestant presence" is significant to the educational tradition and normal operation of KSBE. The will founding the school mandated that the teachers be Protestant. Mrs. Bishop's will, ¶ 13. For the entire life of the school, teachers have been Protestant. Joint stipulation as to facts, ¶ 37. Moreover, the trustees of KSBE have been exclusively Protestant. *Id.*, ¶ 27.

The "Protestant presence" is also significant to the educational character of KSBE. David Kaupu, chaplin at KSBE, states that he believes that "the curriculum of the Schools is directed toward the propagation of the Protestant religion." KSBE motion, affidavit of David Kaupu, at 2; *see also* affidavit of David Kaupu filed May 20, 1991, ¶ 2. KSBE has mandatory religious education requirements covering, *inter alia*, Protestant Christianity. Winegar affidavit, exhibit 7.21 ("Ekalesia" syllabus). Students must pass the religious education classes in order to advance and graduate from the schools. KSBE Motion, affidavit of David Kaupu, ¶¶ 11–12; affidavit of David Kaupu filed May 20, 1991, ¶¶ 3–6.

Finally, KSBE illustrates a good example of how, if the Protestant-only requirement were not maintained, it would be reason-

able to believe that the educational experience would be significantly different. KSBE refers to the practice at the schools where the K through 8 teachers lead their classes in daily prayer. KSBE hypothecates the probable scenario of a non-Protestant teacher refusing to lead the class in prayer. Such a situation would definitely change the educational experience at KSBE.

Application of the *Pime* test indicates that the Protestant-only requirement is valid.

EEOC argues that the case at bar is distinguishable from *Pime*. EEOC notes that *Pime* was a situation addressing the issue of whether a Jesuit-only requirement was valid when a Jesuit university wanted to hire Jesuits for only 7 of 31 teaching positions. In this case, EEOC points out, KSBE wants to use the BFOQ for *all* teaching positions at issue. KSBE rebuts this by correctly pointing out that it is not atypical for BFOQs to apply to a class as a whole. *See Dothard, supra* (women prison guards in "contact" positions).

EEOC also argues that *Pime* should not be followed for the reasons cited by Judge Posner in a concurring opinion in *Pime*. 803 F.2d at 354–58. Those reasons were that the majority opinion should not have reached the BFOQ issue because the BFOQ did not really involve religion, and that there was an inadequate factual record.

The court declines to reject *Pime* on the basis of Judge Posner's arguments. In essence, Judge Posner argued that there was no religious BFOQ involved because Jesuits do not qualify as a religion. This argument is unpersuasive because Loyola was looking to hire persons with certain religious backgrounds. Therefore, it is clear that a religious BFOQ was involved. As to the lack of an adequate record, Judge Posner concluded the record was inadequate to address a different issue—not the issue of a BFOQ.

Moreover, application of the *Johnson Controls* test, the Supreme Court's latest word on BFOQs, indicates that the Protestant-only hiring requirement is a valid BFOQ. *Johnson Controls* asked whether a job qualification was related to the essence or central mission of the employer's business.

EEOC argues that the Protestant-only requirement is not related to the "essence" of KSBE and the teachers' jobs. EEOC argues that the essence of KSBE's business is education, and not religion. To support its point EEOC points to the case of *Collins v. Tavares*, 37 Haw. 109, 111 (1945), which EEOC claims is dispositive of the main purpose of KSBE—education.

The court rejects EEOC's reading of *Collins*. It does not lead to the conclusion that KSBE's main purpose is educational as distinguished from educational with a Protestant perspective. The court reads *Collins* to simply mean that coeducation, as opposed to non-coeducation, was desirable and in accord with efficiently administering the estate and carrying out Mrs. Bishop's intent.

EEOC also claims that the educational essence of KSBE is demonstrated by the fact that the schools admit children of all religions and does not attempt to convert anyone to Protestantism. Further proof, EEOC contends, is found in the fact that KSBE does not require students or teachers to become members of the schools' church (Bishop Memorial Church), as well as the facts that there are no student members at Bishop Memorial Church, no Protestant church has authority over KSBE, the schools' chaplin has no authority over the non-religious curriculum, many educational programs contain no explicit religious content, and KSBE receives federal funds. KSBE points out that in *Pime* many of the same factors existed.

KSBE makes a statement in its opposition to EEOC's motion that merits additional discussion. KSBE states that "it is not inconsistent for [KSBE] to be an educational institution for native Hawaiians as well as a religious educational institution." KSBE's opposition to EEOC's motion, at 36.

Undoubtedly, KSBE has a strong Protestant influence on the standards over and above the religious persuasion of its teach-

ers. KSBE has submitted various documents that support this finding. *See* Winegar affidavit, exhibits 1–9 (school handbooks, brochures, reports, etc. noting religious orientation of schools). Moreover, KSBE has an on-campus church, mandatory devotion times, mandatory religious education, and daily prayer. While Mrs. Bishop intended KSBE to provide education to native Hawaiians, she also wanted them instructed in "morals" and wanted the instruction to come from Protestants. Mrs. Bishop's will, ¶ 13. If one takes the intent of Mrs. Bishop, as expressed in her will, and considers how that intent has manifested itself in terms of the religious atmosphere existing at KSBE today, the inescapable conclusion is that the purpose of the schools is to provide native Hawaiian children with an education from someone who has experienced and presumably has a Protestant point of view.

It is evident that Bernice Pauahi Bishop, who had made the decision to "adopt the children of her people and make them her heirs" and who by her will founded Kamehameha Schools for her adopted children, earnestly intended and provided in her will that her adopted children as students at Kamehameha Schools would receive the same benefits of being taught by Protestant teachers with a Protestant perspective in their teachings as she had experienced herself in her school days at the Chief's Children's School, where she received religious and moral training for some ten years under the tutelage of Protestant missionaries. *See* joint stipulation as to facts ¶¶ 9–12. Beginning with her years as a student/boarder at the Chief's Children's School and continuing throughout her adult life, Mrs. Bishop attended the Kawaiahao Church on a regular basis, taught Sunday School and sang in the sanctuary choir. *Id.*, ¶ 15. This court finds that this intent of Mrs. Bishop has been implemented and fulfilled at Kamehameha Schools (*see* discussion *infra* under section 2).

Further, this Court finds that teachers by their presence and daily contact with students serve as role models and instruct them in morals. The President of Kamehameha Schools averred, "that the teach-

ers' role is one of teaching by example and precept, by letting their exposure to the Protestant tradition and its value system be something they, in turn by background, would bring to their students." Affidavit of Michael Chun, President of Kamehameha Schools.

Paragraph 72 of the Joint Stipulation as to facts shows that roughly ⅓ of the students at the Kamehameha Schools are Protestants, while a little over ⅓ are members of other religions. Although paragraph 73 states that the Schools do not have as a specific purpose the conversion of their non-Protestant students, providing a Protestant presence and perspective affords an out-reach and positive Protestant influence upon these other students. This arrangement also exposes the Protestant students to non-Protestant peers while under the protective influence of Protestant teachers. Mrs. Bishop adopted all of the children of her people and her will did not place any limitation on their religious affiliation.

The court concludes that the essence or central mission of KSBE is to provide native Hawaiians with an education from the Protestant point of view. Because the teachers are required to be Protestant in order to provide a Protestant viewpoint, the requirement that the teachers be Protestant is "reasonably necessary to the normal operation of" KSBE. 42 U.S.C. § 2000e–2(e)(1). Similarly, the essence or central mission of the teachers' jobs is to provide that viewpoint. A Protestant would be best qualified to teach such a viewpoint. The Protestant-only requirement "relate[s] to [the teachers'] ability to perform the duties of the job." *Johnson Controls*, 111 S.Ct. at 1206. In addition, a Protestant-only requirement relates to the "essence" or "central mission" of KSBE's business—providing education from the Protestant perspective. *Id.* at 1205.

The court finds that the "Protestant-only" hiring requirement is a valid BFOQ and exempts KSBE from Title VII.

2. Exempt Religious Organization;
42 U.S.C. § 2000e–1

■ Section 702 of Title VII, codified at 42 U.S.C. § 2000e–1, provides that

[t]his subchapter shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

KSBE claims it is an exempt religious organization under this section. EEOC disputes this.

"Congress's conception of the scope of section 702 was not a broad one. All assumed that only those institutions with extremely close ties to organized religions would be covered. Churches, and entities similar to churches, were the paradigm." *E.E.O.C. v. Townley Engineering & Mfg. Co.,* 859 F.2d 610, 618 (9th Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). The case law is not very helpful because most cases deal with defendants that are clearly religious associations within the meaning of section 702. *Id.* "[T]he central function of section 702 has been to exempt churches, synagogues, and the like, and organizations closely affiliated with those entities." *Id.* (footnote omitted).

The Ninth Circuit was reluctant to define the scope of section 702 and noted that when determining whether an organization is exempt under section 702, "each case must turn on its own facts." *Id.* "All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious. Only when that is the case will the corporation be able to avail itself of the exemption." *Id.* (footnote omitted). Thus, the court is required to engage in a balancing test to determine whether KSBE is exempt.[5]

KSBE presents the following facts to support its assertion that its purpose and character are primarily religious:

(1) All trustees for the 104–year life of the schools have been Protestant;

(2) Mrs. Bishop desired for the children to be instructed in morals by Protestants;

(3) The Hawaii Supreme Court, in *Murray v. Kobayashi,* 50 Haw. 104, 431 P.2d 940 (1967), held that KSBE is operated in connection and is affiliated with the Bishop Memorial Church. The Court in *Murray* interpreted Mrs. Bishop's will to be "permeated with expressions of her interest in the exposition of the Protestant religion [and] [i]n recognition of this interest the trustees established the Bishop Memorial Church as an integral part of [KSBE] and injected religion in the school program. [¶] A review of the record clearly shows that [KSBE] and Bishop Memorial Church are operated by the trustees in connection with one another." 50 Haw. at 106, 431 P.2d 940;

(4) EEOC issued, in the past in the *Puette* case, a no cause determination regarding the Kamehameha schools on the same Protestant-only requirement (Winegar affidavit, exhibits 3–5);

(5) In the *Puette* case, EEOC adopted the Hawaii Department of Labor's finding that KSBE's Protestant-only requirement was exempted under section 702 and Hawaii law (*Id.,* exhibit 4);

(6) KSBE refers to itself as a Protestant school (KSBE's opposition to EEOC's motion, Wong affidavit, exhibit B (advertisement by KSBE for substitute teacher position giving rise to this litigation wherein KSBE refers to itself

**5.** EEOC claims that this court should not engage in the *Townley* balancing test because Congress specifically provided a formula for determining when a religious educational institution is exempt in section 703(e)(2) of the Civil Rights Act. *See* 42 U.S.C. § 2000e–2(e)(2). There is no authority cited for this proposition. While 703(e)(2) addresses "religious schools," likewise section 702 specifically addresses "educational institutions." Although EEOC argues that KSBE is an educational institution, the result of

EEOC's reasoning is that KSBE may not be examined under section 702 to determine whether it qualifies for an exemption as an educational institution which meets the conditions of that statute. In any event, the court declines to accept EEOC's invitation and analyzes whether KSBE is exempt under *Townley*'s section 702 balancing test because section 702 specifically applies to "educational institutions." 42 U.S.C. § 2000e–1. The court will analyze KSBE under section 703(e)(2) below.

as "A Non–Denominational Protestant School."));

(7) KSBE is a non-profit institution;

(8) There has been an unbroken chain of over 100 years of mandatory devotional services, religious education requirements, and prayers at KSBE; and

(9) EEOC found in its determination in the underlying claim that KSBE has a "religious orientation similar to that found in most church-schools." (KSBE opposition to EEOC's motion, Wong affidavit, exhibit C, p. 7 n. 8).

EEOC presents the following facts to show secular characteristics that would support its claim that KSBE's primary purpose is educational and not religious:

(1) Neither Mrs. Bishop's will nor the "Mission Statement" make reference to KSBE as a "religious" school;

(2) The non-profit status of KSBE is based on its being charitable and educational—not religious;

(3) KSBE is involved in land management and portfolio investments (referring to the portion of the trust which manages the assets of the trust);

(4) KSBE impliedly holds itself out as a secular institution by applying for and receiving federal funds;

(5) KSBE is owned, controlled, and supported by a secular estate; and

(6) The Protestant-only requirement is not a tenet of the Protestant faith.

EEOC's cited secular characteristics do not tip the balance in its favor. Several factors that it cites require discussion. For example, its reference to the failure to mention KSBE as religious schools in the will and mission statement as indicative of a secular purpose is contradicted by the Hawaii Supreme Court's decision in *Murray*, EEOC's own admission that KSBE's religious orientation is similar to many other church schools, and the preponderance of evidence submitted by KSBE showing otherwise (Winegar affidavit, exhibits 1–9).

Second, KSBE points out that its non-profit status (charitable and educational basis and not religious) is because of an Internal Revenue Code determination and therefore is non-determinative and irrelevant on

whether it could be exempt as a religious organization under section 702. KSBE's argument has merit as " 'most church-related schools are chartered under the general corporation statutes as nonprofit institutions for the purpose of education.' " *Pime*, 803 F.2d at 358 (Posner, J., concurring).

Third, the fact that KSBE is involved in land management and portfolio investments is irrelevant because the focus of this lawsuit is hiring for the kindergarten through twelfth grade teaching positions at the schools. The inquiry is directed at whether the schools, and not Bishop estate in the aggregate, is a religious organization within the meaning of section 702.

Fourth, the fact that KSBE receives federal funds does not necessarily indicate that it is not religious. Federal funding is not used in studies taught by teachers hired under the "Protestant-only" provision of the Mrs. Bishop's will. Joint stipulation as to facts ¶ 40. It seems to the court that it is a matter of judicial notice that many religious organizations receive state and federal funding.

Fifth, the fact that a Protestant-only requirement is not a tenet of the Protestant faith does not comport with the *Townley* requirement to look at the characteristics of the employer. This factor (Protestant-only requirement is a tenet of the Protestant faith) looks at the Protestant faith and not at KSBE. Further, if this factor were relevant to determining whether an organization was exempt under section 702, it would seem that many religious educational organizations would lose on this point.

The court notes KSBE is owned, controlled, and supported by a secular estate; although all of the trustees of the estate must be Protestant pursuant to Mrs. Bishop's will. In fact, as EEOC points out, KSBE is really anomalous in that the typical religious organization is owned, supported, and/or controlled by a church. Here, KSBE owns, supports, and controls the Bishop Memorial Church. This fact is indeed unique to the cases involving religious organizations.

After reviewing all the above factors, the court concludes the evidence weighs in favor of finding that KSBE has a religious purpose and character under the *Townley* balancing test.

Indeed, the President of Kamehameha Schools averred that the "daily contact with Protestant role models, prayer before meals, devotionals, required religious courses, the Bishop Memorial Church and Chapel on campus, religious programs of the school, deputation teams, and religious extra-curricular activities all speak to the degree to which religion plays a role at Kamehameha." Affidavit of Michael Chun, President of Kamehameha Schools.

The Kamehameha Schools Planning Survey conducted in 1961 by Booz, Allen and Hamilton, Management Consultants, found that, "[i]t appears that, as a devout Christian, Mrs. Bishop believed that young people attending the Kamehameha Schools would benefit from living and learning in an environment that would provide a positive Christian emphasis." Winegar affidavit, exhibit 7.4. At page 56 the Survey found that, "a second important purpose of the preparatory department is to provide a Protestant Christian setting for the education of young children. This purpose is clearly reflected in the program, which includes time for formal study of Christian religion, devotional services, a daily 'quiet time' at the opening of school and other features clearly consistent with this kind of objective." At page 107 of Volume 2 the report concluded, "Kamehameha Schools strive today to educate their students in a Protestant Christian environment and to prepare them for lives as useful and self-sufficient citizens and leaders." At page 27 of Volume 3 the Survey noted that "the objectives of the religious services sponsored by the Kamehameha Schools are to provide a Protestant Christian atmosphere which pervades every aspect of campus life, to encourage worship, to engender an understanding and appreciation of the heritage afforded by Christianity, to provide opportunities for Christian service to others, and to give personal counselling—all for purposes of helping students to shape themselves into persons of good moral character."

The court finds that KSBE is a "religious educational institution" within the meaning of section 702 of the Civil Rights Act and is exempt from Title VII.

3. Exemption Based on Curriculum Directed Toward Propagation of a Religion; 42 U.S.C. § 2000e–2(e)(2)

■ Section 703(e)(2) of Title VII, codified at 42 U.S.C. § 2000e–2(e)(2), provides that

it shall not be an unlawful employment practice for a school college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or substantial part, owned, supported, controlled, or managed by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

The parties have cited no case law explaining the operation of this section. The court has found none in its research. The only authority cited by either party which directly addresses this issue is EEOC Decision 75–186.

EEOC correctly notes that section 703(e)(2) contains two alternative exemptions. The first part of the statute grants an exemption if the school is owned, supported, controlled, or managed by a particular religious corporation, association, or society. The second part grants an exemption if the curriculum of the school is directed toward the propagation of a particular religion. KSBE argues it is exempt under the second exemption of this section.

EEOC claims that KSBE does not propagate the Protestant faith in its education because it does not meet the level of "propagation" required by section 703(e)(2). EEOC cites to *E.E.O.C. v. Southwestern Bap. Theological Seminary*, 651 F.2d 277 (5th Cir. Unit A 1981) as the appropriate

standard to be used in deciding if a school has met section 703(e)(2)'s "propagation" requirement.

EEOC's reliance on *Southwestern Bap.* is misplaced. The case did not consider section 703(e)(2) but rather a completely unrelated matter. The court finds that the more logical standard to use is the one found in EEOC Decision 75–186.

In Decision 75–186, the EEOC held that a school was exempt from Title VII under section 702 and both exemptions contained in section 703(e)(2). *See* EEOC decision 75–186, at p. 4357. EEOC noted, in decision 75–186, "that although religion is not taught as a separate subject, it is an integral part of the child's daily life at school." *Id.* at 4356.

The court notes that the facts and analysis in decision 75–186 are somewhat sparse with respect to the "propagation" exemption. However, the court gleans the following conclusion from decision 75–186: If religion is an "integral part" of the child's daily life at school, then the school propagates religion within the meaning of section 703(e)(2). The court finds that this "integral part" test for determining wheth-

er a school propagates a particular religion seems reasonable and proper. Thus the court will apply it to KSBE in order to determine if it propagates a particular religion.

KSBE points to a number of facts that illustrate the propagation of the Protestant faith at KSBE. *See* KSBE's motion, at 39–42.[6]

EEOC responds by pointing to facts that it claims show the absence of religion. EEOC claims that KSBE's catalogs are without reference to religion, thus illustrating the non-propagation of religion at KSBE. EEOC's motion, at 42. KSBE rebuts by directing the court to a KSBE catalog stating that "[r]eligion is an important part of the educational program." Winegar affidavit, exhibit 7.16, at 10. The court notes that there are also numerous other similar references in school literature. *See e.g.,* exhibit 7.1, at C–7, C–8 (Introduction pamphlet to KSBE); exhibit 7.11, at 10 (KSBE student handbook).

EEOC points to other KSBE publications it claims illustrate a lack of propagation. *See* EEOC's motion, at 42–43. EEOC's use of school literature to prove its point is

---

**6.** KSBE points to the following facts: KSBE is wholly supported, controlled and managed by Protestant trustees; the trustees also operate and control Bishop Memorial Church; the Bishop Memorial Church is operated on the campus of KSBE; the curriculum is directed toward the propagation of the Protestant religion (citing affidavit of David Kaupu); mandatory Sunday chapel attendance for boarders and weekly chapel attendance for all students has been required for over 104 years; required prayer before all meals (with the exception of cafeteria meals for grades 9–12); required religious education for 104 years; certain students are taught by either Christian Education teachers or ordained Protestant ministers; teachers of kindergarten through eighth grade lead their classes in daily prayer before the noon meal; other school events involve prayer (i.e., other meals, athletic events, commencement ceremonies, song festivals); school publications contain religiously-oriented material; and the school encourages and sponsors participation by students in religious organizations. As noted before, the Hawaii Supreme Court, in *Murray,* interpreted Mrs. Bishop's will to be "permeated with expressions of her interest in the exposition of the Protestant religion [and] [i]n recognition of this interest the trustees established the Bishop Memorial Church as an integral part of [KSBE]

and injected religion in the school program. [¶] A review of the record clearly shows that [KSBE] and Bishop Memorial Church are operated by the trustees in connection with one another." 50 Haw. at 106, 431 P.2d 940. To support this finding the *Murray* Court cited to the following "uncontroverted evidence" found by the trial judge which is similar to the evidence in this case:

"The trustees have brought religion into the Schools with: (1) five minutes of daily devotions at the beginning of each school day; (2) a prayer before each meal at Schools; (3) compulsory Sunday Chapel attendance for all boarding students; (4) religious teaching by homeroom teachers in kindergarten and the first and second grades; (5) teaching of religion by Christian Education teachers for 30 or 40 minutes once a week in grades third through eighth; (6) talks by the Chaplin or Assistant Chaplin to classes on religious aspects or allusions in subjects such as science, literature and social studies, in grades ninth through twelfth, about fifty times per year; (7) Sunday School for seventh and eighth grade students; and (8) voluntary student activity in connection with the school Chapel or religious or quasi-religious organizations at the Schools."

*Id.* at 106 n. 3, 431 P.2d 940.

**1328**

unavailing. EEOC selects portions of the schools' publications that do not refer to religion to make its point. These contentions must fail in light of the fact that the KSBE publications are replete with references to religion. *See generally,* Winegar affidavit, exhibits 1–9.

EEOC also seems to argue that the lack of a concerted effort to convert non-Protestants by KSBE is indicative of non-propagation. However, the Protestant presence and perspective in teaching affords an outreach and exposure to spread the Protestant religion to the non-Protestant students. More importantly, the curriculum nurtures and develops the religious beliefs of the Protestant students.

EEOC also claims there is a lack of propagation illustrated by the fact that KSBE does not monitor whether its teachers have integrated the tenets of Protestantism into their work and lives.[7] It is likely there would be an expressed public outrage if KSBE was to look over the shoulders of its teachers and supervise their daily lives. Moreover, this argument misses the mark in the inquiry under section 703(e)(2). The court should be looking at the curriculum, not the teachers' personal lives to determine whether the schools propagate religion. In any event, the foregoing evidence that the school is involved in the propagation of religion negatives any possible inference that KSBE's refraining from monitoring teachers' activities indicates the non-propagation of religion.

Based on the evidence adduced by the parties, it is clear that "religion ... is an integral part of the child's daily life at" KSBE, EEOC Decision 75–186, at 4356, and that, "the School's curriculum 'is directed toward the propagation of a particular religion,' i.e., [Protestant] Christianity," *Id.* KSBE is exempt from Title VII under the "propagation" prong of section 703(e)(2). An indication of the Kamehameha Schools

fruitfulness in fulfilling the directive of Mrs. Bishop in her will to provide "instruction in morals and in such useful knowledge as may tend to make good and industrious men and women" through teachers of the Protestant religion is shown by the fact that some 14 Protestant ministers who graduated from the Kamehameha Schools participated in the dedication service of the Bernice Pauahi Bishop Memorial Chapel on April 3, 1988. Winegar affidavit, exhibit 7.8. In addition, EEOC found in its determination in the underlying claim that KSBE has a "religious orientation similar to that found in most church-schools." (KSBE opposition to EEOC's motion, Wong affidavit, exhibit C, p. 7 n. 8).

### IV. CONCLUSION

The court grants KSBE's motion for summary judgment. The court finds that KSBE is exempted from Title VII under 42 U.S.C. § 2000e–2(e)(1), 42 U.S.C. § 2000e–1, and 42 U.S.C. § 2000e–2(e)(2). Accordingly, EEOC's motion for summary judgment is denied.

---

**7.** The joint stipulation, however, does provide that prior to April 1988, KSBE required all teachers, at the time of hire, to provide KSBE with either a copy of a baptismal record or a letter from their minister attesting to their membership with a Protestant church. Subsequent to April 1988, KSBE required all new teachers subject to the Protestant-only hiring

requirement to sign a certification statement attesting his/her membership in the Protestant religion at the time of hire. The certification provided that upon KSBE's request the teacher must provide a baptismal record or letter from a minister attesting to the teacher's membership in the Protestant religion.